## ANDREW B. COBB v. JAMES L. DAVENPORT.

1. The soil under the waters of fresh water lakes, within the boundaries of the original grant of the province of New Jersey, is in the proprietors and not in the state, and may be acquired by an individual owner by grant from the council of proprietors.

2. The exclusive right of fishery is *prima facie* in the owner of the soil, but may be acquired separate from the ownership of the soil by grant or prescription.

3. A right of fishery in private waters cannot be claimed by custom, but must be prescribed for in a *que estate*, and a right claimed by prescription is not established by proof of customary right.

4. In analogy with the statute of limitations, which does not apply to incorporeal hereditaments, an adverse user of an incorporeal hereditament for the period of twenty years, affords a presumption of a grant which has been lost.

5. An user, to be adverse, must be under a claim of right against the true owner, with such circumstances of notoriety as to afford an indication to the owner that a right is claimed against him.

6. When the owner of a fishery does not himself work it for profit, but suffers the public to fish in it without objection, an user by an individual, which is not distinguished from that of the public, will be con-

sidered permissive, and not adverse, unless there is evidence that it was under a claim of right in himself, and that the owner, knowing of such claim, acquiesced in it.

7. That the defendant, or those under whom he claims, erected a hotel for the accommodation of the public who might visit a lake—the ownership of which is in another—for the purpose of fishing, is not evidence of a prescriptive right in the defendant to fish therein.

In trespass, and rule to show cause why the verdict for defendant should not be set aside.

The plaintiff, claiming to be owner of a fresh water lake without an outlet, called Green's pond, in the county of Morris, brought trespass against the defendant for breaking his close, and fishing on lands of the plaintiff, covered with water. The defendant pleaded the general issue, denying the exclusive right of fishing in said water, as claimed by the plaintiff. He also set up the statute of limitations and license from plaintiff. In addition to these, he defended under two several grants from the board of proprietors of East Jersey—one to James Kitchell, and the other to Benjamin Howell—of certain parcels of land adjoining said pond, and giving the right of fishing therein. Also similar grants from the plaintiff to the same persons, they then being owners and occupiers of said premises, and of which the defendant, at the time when, &c., was owner; and which deeds have been lost and destroyed by accident, &c.

At the trial before the Morris Circuit, a verdict was rendered for the defendant, and a rule to show cause why the same should not be set aside was granted.

Argued before BEASLEY, C. J., and Justices BEDLE and DEPUE.

*J. Vanatta*, (with whom was *J. P. Bradley*,) for the rule.

The trespasses complained of are breaking the close, treading down the grass, and fishing on lands of the plaintiff,

covered with water, called "Green Pond," in Morris county. It is a fresh water lake, without an outlet, about two and one-half miles in length and half a mile in breadth.

Plaintiff proved his right to the *locus in quo*, by surveys regularly made and confirmed by the board of East New Jersey proprietors. One dated March 25th, 1839, for $163\frac{19}{100}$ acres, about ten acres of which were covered with water; the other dated August 11th, 1856, for $444\frac{76}{100}$ acres, (the principal part of which is covered by the waters of Green Pond.)

Being owner in fee, the plaintiff claims that he has a several and exclusive right of going upon that land for all purposes, fishing included.

The defendant insists:

I. That the lake is not the subject matter of private property; that it is like the arms and bays of the sea, and like public navigable rivers where the tide ebbs and flows.

The term navigable has two meanings.

At common law it applies to a stream where the tide ebbs and flows, and is sufficient for the purposes of navigation. In popular acceptation it means rivers above the influence of tide, and large enough to be of public use for the passage of boats. *Angell on Tide Waters* 74–79; *Genessee Chief et al.* v. *Fitzhugh et al.*, 12 *How.* 443.

There being no tide at or near the *locus in quo*, none of the incidents to tide-water, or to lands covered with tide-waters, pertain to this case.

But if the lake be considered as navigable, and may be used as a highway, the soil or bed of the lake cannot be considered as public property; it is in the riparian owner, and the right of fishing is also. *Angell on Tide W.* 75, 76; *Wadsworth* v. *Smith*, 2 *Fairf.* 280; *Arnold* v. *Mundy*, 1 *Halst.* 1, 67–83; *Ex parte Jennings*, (*note*) 6 *Cow.* 518.

There are American cases to the contrary, but all rest on some local law or reason, outside of the common law. Such are the cases in Pennsylvania. *Carson* v. *Blazier*, 2 *Bin.* 475; *Shrunk* v. *The President of, &c.*, 14 *S. & R.* 71,

which go upon the ground that the beds of the large navigable rivers were never granted to the riparian owners. The case in Alabama, *Bullock* v. *Wilson*, 2 *Porter* 436, rests upon an act of Congress and acts of the state legislature, declaring all *navigable* waters and water courses free and open. In North Carolina, *Wilson* v. *Forbes*, 2 *Dev.* 30, it was held that on a navigable stream above tide, the riparian owner's title extends only to low water mark.

A distinction is sometimes adverted to between lakes and rivers. *Ang. on Wat. C.*, § 41. Its only practical effect is as to *constructive* boundary. So considered in the *State* v. *Gilmanton*, 9 *N. Hamp.* 441. In Maine, *Bradley* v. *Rice*, 1 *Shepl.* 198, it was a question of boundary of land, and the court held that the construction which extends land to the centre of a stream in a river, does not apply to a pond or lake. In New York, the state holds the residuary title to all unappropriated lands, and a grant of the bed of a lake vests the title in the grantee. *Champ. R. R. Co.* v. *Valentine*, 19 *Barb.* 84.

The state of New Jersey has disclaimed all title to the bed or waters of Green Pond, and recognized both as private property. See Charter of the Morris Canal Co. (*Laws of 1824*, 89–91.)

II. But the lake in question is not navigable. It has no commercial inlet or outlet. It is not navigable for any purposes useful to trade, or commerce, or agriculture, and is, therefore, not navigable in any legal sense. *Washb. on Easements*, § 395, § 400.

III. Defendant pleads a right to fish in the *locus in quo*, in virtue of *lost grants* from the board of proprietors and from the plaintiff.

It was shown that such grants were never made. The only evidence of the defendant, in support of lost grants, showed that all and any persons, so inclined, fished in the lake, as they would hunt upon wild lands. There is no evidence

of a private, several grant, such as is alleged in the pleas.
*Blewett* v. *Tregonning*, 3 *Ad. & El.* 554; *Donnell* v. *Clark*,
19 *Maine* 175.

The plaintiff offered no evidence of grants except user. User,
to be available, must contain three elements:

1. It must be adverse—that is, under claim of right.

2. It must be known and acquiesced in by the owner.

3. It must be continuous and uninterrupted.

Adverse user, under the defendant's pleas, is not sustained
by proving that he fished, as all others did. He sets up a
peculiar right. *Kilburn* v. *Adams*, 7 *Metc.* 33; *Inhab. of
1st Parish in Glouc.* v. *Beach*, 2 *Pick.* 60, *note*.

All the land covered by water (except about ten acres too
shallow for fishing) was in the board of proprietors, until
August 11th, 1856. It was in a mountainous region, and in a
state of nature. As to all such lands and waters, the common
understanding is that they will be hunted over and fished in
without objection. The consent of the proprietors is implied.
Such user affords no presumption of a grant, nor does non-
user by the proprietors.

" The presumption of a grant can never fairly arise, where
all the circumstances are perfectly consistent with the non-ex-
istence of a grant." See Story, J., in *Ricard* v. *Williams*, 7
*Wheat.* 109. See, also, *Washb. on Easement, p.* 92; *Rowland*
v. *Wolf*, 1 *Bailey, S. C.,* 56; *McKee* v. *Garrett, Ibid.* 341;
*Nash* v. *Peden*, 1 *Spears, S. C.,* 17; *Hogg* v. *Gill*, 1 *McMul-
lan, S. C.,* 329; *Donnell* v. *Clark*, 1 *Appleton* (*Maine*) 174;
*Collins* v. *Benbury*, 5 *Iredell* 127; *Bethum* v. *Turner*, 1
*Greenl.* 115; *Prop'rs of the Kennebec Purchase* v. *Springer*, 4
*Mass.* 416; *Nickerson* v. *Brackett*, 10 *Mass.* 216; *Cornelius &
Empson* v. *Giberson*, 1 *Dutcher* 1.

2. As there was no adverse claim or user, there could be
no acquiescence.

3. The user, such as it was, was not continued twenty years.

The verdict was against law and evidence, and should be
set aside.

*H. C. Pitney,* (with whom was *J. Van Dyke,*) contra.

The plaintiff claims an exclusive right of fishing in the waters of Green Pond, and sues defendant for fishing therein. Defendant pleads the general issue, and a right under grants now lost.

· I. Green Pond is a natural lake, three miles long and nearly one mile wide,· deep enough to float large vessels. Its outlet is not navigable, and the lake has never been navigated for purposes of commerce.

Our position is, that this lake, and all other fresh water inland seas, should be classed with the bays and arms of the sea where the tide ebbs and flows, and subjected to the rulings of the court in *Arnold* v. *Mundy,* 1 *Halst.* 1, and *Martin* v. *Waddell,* 16 *Peters* 367. They are public waters.

The test of the ebb and flow of the tide, adopted in Great Britain, is artificial and arbitrary, and not fitted to the situation of this country.

Are the waters *actually navigable?* That is the practical test. The tidal test contains no principle, and has not been adopted here as part of the common law.

· In New Jersey the ownership of vacant lands is in individuals. The state never owned any except those covered with its navigable waters. In all other states the vacant lands are owned by the state or the United States. Hence the exact question under consideration could never have arisen except in this state. It has, however, been much discussed. In Pennsylvania it is settled that the state owns the beds of all navigable waters without regard to tide. *Carson* v. *Blazer,* 2 *Bin.* 475; *Shrunk* v. *Schuylkill Nav. Co.,* 14 *S. & R.* 81–84; *Coovert* v. *McConner,* 8 *Watts* 476.

These cases all go upon the ground that the tidal test does not apply to our vast inland waters.

So in North Carolina. *Collins* v. *Benbury,* 5· *Ired.* 118; and *S. C.,* 3 *Ired.* 277; *Wilson* v. *Forbes,* 2 *Dev.* 30; *Ingram* v. *Threadgill,* 3 *Dev.* 39. In South Carolina. *Cates* v. *Wadling-*

*ton*, 1 *McCord* 581. Alabama. *Bullock* v. *Wilson*, 2 *Port.* 436. Iowa. *Haight* v. *Keokuk*, 4 *Iowa* 199. Missouri. *O'Fallen* v. *Daggett*, 4 *Napt.* 343.

In the eastern states, generally, and in some of the western states, the tidal test has been adopted in determining the question of boundary between the shore line and *medium filum aquæ*, but in these the right of the public to the free navigation of the fresh water streams has been maintained. The tidal test appears to have been abandoned in New York. *The People* v. *Canal Comm'rs*, 6 *Tiff.* 461.

The rule of the common law was applied to *rivers* above tide, never to a lake. The Supreme Court of the United States has assumed maritime jurisdiction of all fresh water navigable streams and lakes. *Genessee Chief*, 12 *How.* 443–454.

A private individual cannot own the bottom of a navigable lake, and the exclusive right of fishing therein. Such a title can only be derived from the legislature, and none such has been given in this case.

The king could not, since Magna Charta, grant the bottom of navigable waters. 1 *Halst.* 71–77; 2 *Zab.* 458; and of course the grant of Charles II. to the Duke of York, under which the plaintiff claims, could confer none.

Individuals in this state have obtained certain exclusive rights of fishing in some of the waters of this state, but they are riparian in their character, and depend not on the actual ownership of the *alveus*, but a sort of local common law recognized by the courts. *Gough* v. *Bell*, 2 *Zab.* 461; 3 *Zab.* 656; *Martin* v. *Waddell*, 16 *Peters* 387; *Bennett* v. *Boggs*, *Baldwin C. C. Rep.* 76; *Penn. N. J. Rep.* 638.

Green Pond is a navigable lake, *in fact*. It is no objection that it is not actually navigated. All our lakes were once in the same situation.

The general sentiment and understanding of the people of the northern part of the state has always been, that the lakes in that region, such as Hopatcong, Budd's Lake, &c., are public property, and free to all citizens. It is a local law,

which should be respected. See *Gough* v. *Bell*, and *Martin* v. *Waddell*, *supra*.

Extensive improvements have been made on the shores of most of these lakes, based on this understanding—some by the defendant on the shores of Green Pond.

The right of the public has been frequently recognized by the legislature. *Lake Hopatcong, Pamph. Laws*, 1852, *p.* 143; and in 1854, *Pamph. Laws* 445; *Budd's Lake*, in 1853 and in 1854.

Fishing naturally belongs to the public. *Angell on Tide Water* (1826) 19–25; *Washb. on Ease.* 410; *Angell on Water Courses* 67, § 66. By the civil law all fisheries are public.

Again: the evidence shows that the plaintiff and his father encouraged this idea of the public right. They rented the Day farm for the purposes of a hotel for many years. It was a place of public resort, and enhanced the value of the lands.

Plaintiff's conduct, as shown by the evidence, amounts to a dedication, and he is estopped from setting up that the fishing is not public.

II. But if plaintiff has shown title to the bottom of the lake, our pleas of lost grants are fully sustained.

1. Evidence that such grants were never made, is no answer to our case.

It is not necessary to show that such grants ever existed. The right arises not out of the supposed grant, but out of long continued user. *Wash. on Ease.*, § 66 *to* 71; *Angell on Water Courses*, § 44; *Gale & What. on Ease.* 66–91; 2 *Wms. Saund.* 175.

2. The user was open and continuous, " *longus usus, nec clam, nec per vim, nec precario.*"

It is presumed adverse until the contrary is shown. *Washb.* 91, 92; *Hammond* v. *Zehner*, (7 *Smith*) 21 *N. Y.* 118.

The proof is, that Allison and Davenport always fished in the lake, not as a favor, but of right. Lands were bought,

improvements made, boats supplied, and openly used for fishing by guests who resorted to the hotel. Of this plaintiff had notice, and acquiesced in it.

A verbal claim of right is unnecessary. A claim may be as clearly shown by circumstances and the conduct of parties. *Washb.* 111 ; *Gale & Whate.* 82 ; *Gray* v. *Bond,* 2 *Brod. & B.* 667.

A parol grant—a mere license—a long series of trespasses —ripen into a right. *Washb.* 88.

The doctrine of adverse user is by way of analogy to the statute of limitations. The statute runs against the proprietors. They are but individual land owners, and liable to the incidents of private ownership. *Washb.* 72 ; 1 *Dutcher* 1.

3. As to length of time. The time of the different occupants may be added together. *Angell on Lim.* 413.

Adverse user by tenant enures to the benefit of the land owner. *Gale & Whate.* 120.

The question of *lost grant* was for the jury, (*Angell on Water Courses,* § 221,) and the judge should have permitted them to pass upon it.

The jury were fully justified in finding as they did, on the main question in the cause, and we submit that their verdict should stand.

The opinion of the court was delivered by

DEPUE, J. The water in question is a natural, inland, fresh water pond or lake, three miles long and one mile in width, and of sufficient depth to float large vessels. It has never been navigated by vessels larger than fishing craft, thirty feet long, propelled by oars or sails, and has no navigable outlet. To the soil of the pond, and consequently the waters thereof, the plaintiff claims title, by virtue of two several grants from the board of proprietors of East Jersey—the one dated on the twenty-fifth of March, 1839, for $139\frac{19}{100}$ acres, and the other, dated on the. eleventh day of August, 1856, for $444\frac{76}{100}$ acres. Within the metes and bounds of these two grants, the land under the waters of

the pond is included, with the exception of a small portion at the north end.

The defendant, in the first place, insists that the plaintiff acquired no title to the *locus in quo* under the said grants, because the title to the lands under the waters of the pond was not in the proprietors, but in the State of New Jersey. This constituted the main subject of discussion on the argument before this court.

The policy of the common law is to assign to everything capable of ownership a certain and determinate owner, and for the preservation of peace, and the security of society, to mark, by certain *indicia*, not only the boundaries of such separate ownership, but the line of demarcation between rights which are held by the public in common, and private rights. If capable of occupancy, and susceptible of private ownership and enjoyment, the common law makes it exclusively the subject of private ownership; but if such private ownership and enjoyment are inconsistent with the nature of the property, the title is in the sovereign, as trustee of the public, holding it for common use and benefit.

In pursuance of this policy, by the common law all waters are divided into public waters and private waters. In the former, the proprietorship is in the sovereign; in the latter, in the individual proprietor. The title of the sovereign being in trust for the benefit of the public—the use, which includes the right of fishing and of navigation, is common. The title of the individual being personal in him, is exclusive—subject only to a servitude to the public for purposes of navigation, if the waters are navigable in fact.

The test by which to determine whether waters are public or private, is the ebb and flow of the tide. Waters in which the tide ebbs and flows—so far only as the sea flows and reflows, are public waters; and those in which there is no ebb and flow of the tide, are private waters.

These principles of the common law are so well settled, that a citation of authorities on the subject is quite unnecessary. They are stated and illustrated in Hale's Treatise,

*De Jure Maris*, (*Harg. Law Tracts*,) a book of so high authority, that from it there seems to be no appeal, either by sovereign or subject, upon any question relating to their respective rights, either in the sea, arms of the sea, or private streams of water. 6 *Cow.* 536, *note to Ex parte Jennings; The People* v. *Platt*, 17 *Johns.* 210, per Spencer, J.; *Hooker* v. *Cummings*, 20 *Johns.* 90; *Morgan* v. *Reading*, 3 *Smedes & Marshall* 366; 3 *Kent* 411, 412; 2 *Washb. R. Prop.* 632.

And all the cases in which waters above the ebb and flow of the tide, such as the great inland lakes and the larger rivers of the country, are held to be public in any other sense than as being subjected to a servitude to the public for purposes of navigation, are confessedly a departure from the common law.

The tidal test, as distinguishing waters in which the property is in the sovereign, from those in which it is in private individuals, was said on the argument to be founded in no principle. Many of the rules of the common law, by which rights are ascertained and property is acquired, held, and transmitted, if subjected to such criticism would be found to be equally devoid of principle. As a rule by which individuals may be guided in ascertaining what rights belong to them, as a portion of the public, and what are exclusively within the domain of private ownership, it has the merit of uniformity and certainty, and is easy of application. The criterion suggested on the argument, of holding all rivers which are navigable in fact to be public rivers, and those which are not navigable in fact to be private rivers, is wanting in that accuracy and certainty at which the law aims. It can only be made certain by the addition of some arbitrary rule, such as depth of water, quantity of tonnage, or the like, and even then is still open to the objection that no man can tell whether he is exercising a public right, or trespassing upon a private right, without entering upon an investigation, and thus the way is opened for discussion and disturbances.

A more perfect system of regulations on this subject, than

that stated by Lord Hale, could not be devised. It secures common rights as far as the public interest requires, and furnishes a proper line of demarcation between them and private rights, (per Swift, C. J., *Adams* v. *Peare*, 2 *Conn.* (*N. S.*) 483.) Valuable interests—such as the rights of fishery, to the soil in the bed of the stream, and of mines and minerals that may be therein, and of having a boundary, if on a private river, and consequently the ownership carried " *ad medium filum aquæ*," instead of the precarious right of mere adjacency, depend upon this system. By it navigation is adequately protected, for all waters, whether public or private, if navigable in fact, to that extent are subjected to public use ; and there is no justice or propriety in making these private rights to depend on the question of navigability, with which they are in no wise connected.

In this state there is nothing in topography or location that requires a departure from the rules of the common law. Unlike some of our sister states, we have no large inland lakes, which are, in fact, inland seas, upon which an extensive commerce is carried on, or which are the boundaries with a foreign nation. None of our inland lakes have been required for the purpose of commerce, and only one—Lake Hopatcong, through which the Morris canal runs—has been used for navigation. Our system of land titles, and the decisions of our courts, have been in conformity with the common law on this subject, and whatever departure has been therefrom, has not been to enlarge the public domain at the expense of private ownership, but rather to permit encroachments upon the public right for the benefit of adjacent individual proprietors. *Arnold* v. *Mundy*, 1 *Hal.* 1 ; *Gough* v. *Bell*, 2 *Zab.* 440; *Bell* v. *Gough*, 3 *Zab.* 624; *Martin* v. *Waddell*, 3 *Harr.* 495.

In these cases the tidal test, as distinguishing the *jus publicum* from the *jus privatum*, is recognized, and is assumed to be in force in this state. And it should not be overlooked, in this connection, that the title to the soil in the territory which constitutes the state of New Jersey, passed from the

crown in 1664, the date of the first grant of Charles the Second to the Duke of York, and that this grant, as well as the surrender by the proprietors in 1702, was made when the English common law was in full force, and before any local common law had opportunity to take its origin. The instruments of grant and surrender, so far at least as private rights are concerned, are, therefore, to be construed by the rules of the common law which were then in force.

Reference was made, on the argument, to the Delaware river, and the uses to which it has been subjected by legislative authority.

It was held by the crown lawyers, at a very early period, (August 5th, 1721,) that no part of the Delaware river, or the islands lying therein, were comprised within the grant to the Duke of York. *Chalmers' Opinions* 90. And it was so held by Washington, J., in *Corfield* v. *Coryell*, 4 *Wash. C. C.* 371, a case in which a boundary on that part of the river where the tide ebbs and flows, was involved. The legislature, also, has at different times authorized the appropriation of the waters of the river for canals and waterpowers, without making any provision for compensation to owners of lands along the stream, for injury to their water rights. But it is, nevertheless, true, that the proprietors asserted a right in the river, both above and below tide-water, as far back as 1683. And by certain grants and concessions made by the proprietors, in 1676, the liberty of fishing in the Delaware was granted to all the inhabitants of the province, (*L. & Spicer* 390,) under which grant, probably to this day, the right of fishing in the body of the stream is exercised.

The commissioners on the part of New Jersey, appointed under the act of March 25th, 1817, for settling differences between New Jersey and Pennsylvania, distinctly asserted the right of private ownership in the lands under the waters of the Delaware river.

In a communication addressed by them to the commissioners on the part of Pennsylvania, of the date of September-

ber 16th, 1817, they say : " The soil of the river to the mid-
way thereof, at least at and above the falls of Trenton, if
not below, is vested by law in the owners of the adjoining
lands.   It is true, the same principle of law that vests this
private right in the owners of the adjacent soil, also vests in
the public the right of unobstructed navigation ; we admit
that this private right must be so exercised as not to injure
the public right of navigation." (*Report*, *p.* 17.)   The
Pennsylvania commissioners insisted upon applying to the
Delaware the rule of the civil law which is in force in that
state, in respect to her large rivers.   The discussion between
the commissioners on this subject was quite warm, and
without coming to any agreement on this point, and expressly
waiving further discussion of the question, they finally came
to an agreement as to the navigation and jurisdiction of the
river.   And in the case of *Rundle* v. *The Delaware and
Raritan Canal Co.*, decided in the U. S. Circuit for New
Jersey, in April, 1849, 1 *Wallace, Jr.*, 275, Justice Grier
says (*page* 294): " The river Delaware is the boundary be-
tween the States of Pennsylvania and New Jersey.   The
tide ebbs and flows to the part of the Trenton Falls where
the Trenton bridge crosses the river ; above that point it is a
fresh water stream.   Previous to the revolution, the channel
and waters of the river, so far as the river was *navigable* in
the common law sense of the term, were vested in the king
of England.   The grant, both for New Jersey and for Penn-
sylvania, was bounded by the river Delaware.   So far as the
tide ebbed and flowed, these proprietors had no title to the
bottom of the river below low water mark.   But above the
bridge, and the flow of the tide, the proprietors of each
province held *ad filum medium aquæ*, by the established
principles of the common law, according to which their respec-
tive grants must be construed."   And after stating the com-
mon law rule as to the ownership of fresh water streams, as
laid down by Lord Hale, he proceeded to decide the case in
accordance with the law of Pennsylvania, (which he declared
to be different from that of England, and most of the other

states of the Union,) because the property injured was in the state of Pennsylvania. See also the opinion of the same judge, in the same case, in the Supreme Court of the United States. 14 *How.* 90–91.

There is no necessity for considering, at this time, the extent of the rights of riparian owners in the waters of the Delaware above tide-water. The legal *status* of that river is peculiar, and whatever rights in it may be supposed to be in the state above the ebb and flow of the tide, beyond those connected with navigation, seem to be based upon a question as to the original boundary of the province. No such question is involved in this case. The waters of the pond are within the admitted boundaries of the grant of the province.

The opinions above quoted are merely referred to as very respectable authority, in recognition of the right of private ownership in fresh water streams, as the law in New Jersey. No decided case, and it is believed, no *dictum* of our courts can be found, in which such right is denied as to fresh waters within the original boundaries of the province.

The attention of the court was also directed to various fishery acts, as legislative recognition of the rights of shore owners in the waters of the Delaware. It is unnecessary to refer to these several acts, as in the act incorporating the Morris Canal and Banking Company there is an express legislative declaration that the waters of this pond were private waters, and that the same was private property. By the eleventh section of that act, (*Acts* 1824, *p.* 165,) it is enacted, " that it shall be lawful for the said company to raise the waters in the Green Pond, and Lake Hopatcong, commonly called the Great Pond, by damming the same, and to use the surplus waters thus saved, and so much water of said ponds as shall be necessary, for said canal, and to take and convey said waters into said canal; all loss and damages to *the owners* of said ponds, or the lands flowed or otherwise used in obtaining water for the same, being paid for, agreeably to the previous provisions of this act."

This distinct legislative recognition of the right of private

ownership in this pond, renders superfluous further research and inquiry.

The conclusion is, that the title to the soil under Green Pond was in the proprietors, and not in the state, and that the plaintiff acquired title to the bed of the pond by the grants in question. By virtue of such ownership, and as incident thereto, the plaintiff is *prima facie* entitled to the exclusive right of fishery therein, and may maintain an action of trespass for entering upon the said waters and fishing therein. *Woolrich on Waters* 112, 238; *Schultes on Aquatic Rights* 85, 86; *Angell on Water Courses*, § 61, 73; *Hooker* v. *Cummings*, 20 *Johns.* 90; *McFarlin* v. *Essex Co.*, 10 *Cush.* 309, 310; *Carter* v. *Murcot*, 4 *Burr.* 2162.

While the right of fishing is *prima facie* exclusive in the owner of the soil, as part of the inheritance, yet it is not inseparable from the soil, but may be acquired, distinct from the ownership of the soil, by grant or prescription; and such grant may confer upon the grantee a right of fishing, exclusive of the owner of the soil, whereby a several fishery is granted, or may be a license for him to fish in common with the owner and others, whereby a common of fishery is created. *Schultes* 85 to 90; *Woolrich on Waters* 110 to 114; *Angell on Water Courses*, § 71 to 74; *Wasb. on Ease.* 410, 411 to 421; 1 *Co. Litt.* 122, a, and note 7; *Melvin* v. *Whiting*, 13 *Pick.* 184; *McFarlin* v. *Essex Co.*, 10 *Cush.* 311.

The defendant, by his fourth and sixth pleas, pleaded a justification under two several lost grants, made by the board of proprietors of East Jersey, the one to James Kitchell, his heirs and assigns, owners and occupiers of a certain lot called and known as the Kitchell lot, and the other, to one Benjamin Howell, his heirs and assigns, owners and occupiers of a certain other lot, called the Day lot; and by his fifth and seventh pleas, he pleaded lost grants to the same persons, owners, and occupiers of the same premises, from Andrew B. Cobb, the plaintiff; of which two lots the said defendant, at the said time when, etc., was the owner.

In analogy within the statutes of limitation, which do not apply to incorporeal hereditaments, an adverse user for the period of twenty years of an incorporeal hereditament, affords a presumption of a grant which has become lost. To constitute such an user or enjoyment as raises the presumption of a grant, requires that it should have certain qualities and characteristics, such as being adverse, continuous, uninterrupted, and by the acquiescence of the owner of the inheritance in which the right is claimed. *Washb. on Ease.* 70; *Angell on Water Courses*, § 210; *Arnold* v. *Stevens*, 24 *Pick.* 110.

The idea of an adverse possession is based upon a disseisin. In the case of a corporeal hereditament, every presumption will be made in favor of the true owner, whose legal title draws to it possession. A bare possession is evidence of no more than a present occupation by right. To ripen into title under the statutes of limitation, it must be adverse—by which is meant an actual, visible, and exclusive appropriation of the land, with the intention to claim title against the true owner. *Angell on Limitations*, § 385, 390; *Cornelius* v. *Giberson*, 1 *Dutcher* 1; *Ricard* v. *Williams*, 7 *Wheat.* 59.

An entry by one on the land of another, is or is not an ouster of the legal possession arising from the title, according to the intention with which it is done. *Ewing* v. *Burnet*, 11 *Pet.* 41.

The possession must be actual, continued, hostile, or adverse, visible, notorious, and where the entry is not under any deed or written title, distinct or definite in extent. *Am. note to Nepean* v. *Doe*, 2 *Sm. L. Cas.* 637 *to* 643, 6*th Am. ed.* ; *Den, ex dem. Saxton*, v. *Hunt, Spenc.* 487.

Whether the possession is sufficiently hostile and notorious to oust the true owner, will depend much upon the situation and condition of the property, and the uses to which the real owner designedly or permissively subjects it. *Ewing* v. *Burnet*, 11 *Pet.* 53.

Where a tract which is attached to an academy is pur-

posely left unclosed, and the owner of adjoining land passes over such tract for twenty years, in common with those for whose use it is appropriated, and more frequently than any other person except them, such passing is to be regarded as permissive and not-adverse; so that he acquires no right of way unless he does some act indicating a separate and exclusive use under a claim of right. *Kilburn* v. *Adams*, 7 *Metc.* 33.

To constitute a disseisin of the owner of uncultivated lands, the entry and occupation of the disseisor must be such that the owner may be presumed to know that there is a possession adverse to his title. *Proprietors* v. *Springer*, 4 *Mass.* 416.

"Undoubtedly," says Clerke, J., in *Hammond* v. *Zehner*, 21 *N. Y.* 118, "the object of the law in requiring that possession or user should be adverse, is that the person against whom the claim is made, or the right is exercised, should be made aware of the fact, so as to give him an opportunity of legally resisting before the time for doing so, limited by the statute, has expired. Generally, mere possession or use would be sufficient to arrest his attention and put him on inquiry. To effect this, it is necessary, in many cases, that the person in possession, or exercising the use, should give some additional indication that it was hostile to another's claim." See, also, per Shaw, C. J., in *Blood* v. *Wood*, 1 *Metc.* 535.

The rule to be deduced from the cases is, that the statute proceeds upon the ground that there has been an *acquiescence* on the part of the owner of the land in a claim which, on the part of the disseisor, was intended to be hostile, and, in fact, is hostile to his title; and, obviously, it must appear that the possession or use which is claimed to be adverse, was such that the owner knew, or might have known, that the disseisor intended to make title under it.

The doctrine of prescription being based upon an analogy with the statutes of limitation, depends upon the same principles, and, consequently, the rules by which the question,

whether a right to an incorporeal hereditament has been acquired is to be solved, are stated in the books, in conformity with the rules by which the question, whether the possession of a corporeal hereditament is adverse, is determined. The user must be adverse, and not by sufferance. It must be contrary to the interests of the owner, and under a claim of right against the true owner, and by his acquiescence, he knowing of such use, and not objecting thereto; and the user must be of such a nature as to afford an indication to the owner that a right is claimed against him. *Washb. on Ease.* 86, 87, 97, 112; *Angell on Water Courses*, § 221; 2 *Washb. Real Prop.* 42, 45; 2 *Greenl. Ev.*, § 539; *Sargent* v. *Ballard*, 9 *Pick.* 254; *Powell* v. *Bagg*, 8 *Gray* 441, 443; *Davies* v. *Stephens*, 7 *C. & P.* 570; *Gale & What. on Ease.* 87, 108, 121; *Arnold* v. *Stevens*, 24 *Pick.* 110.

Where the thing prescribed for is an easement, such as a right of way, or of overflowing lands, there is little difficulty in applying the rules of adverse possession of a corporeal hereditament, to the determination of the question whether the user is adverse, because of such use or enjoyment being a direct and palpable interference with the owner in his property, and contrary to his interest. But where the right claimed is a mere *profit a prendre*, as hunting, hawking, or fishing, it is difficult to bring it within those rules, and especially so where the right claimed is of hunting over wild lands, or fishing in secluded waters, when the owner does not himself use the game or fish for a pecuniary profit, but suffers the public in general to hunt and fish without interference. To hold that a right of hunting over another's wild lands, or even over lands under cultivation, was established by showing that the person claiming the right, and those under whom he claims, had at pleasure hunted for game on the premises for the period of twenty years, would be monstrous. Such acts of hunting would be considered to be merely permissive, unless there was clear evidence that they were done under a claim of right, and that the owner knew of such claim, and knowing it, ac-

quiesced in it. There being no actual disseisin or user, exclusive of others, the use could not be considered sufficiently hostile and notorious to establish a right against the true owner, unless the intention to claim against his interest was shown by evidence equally indicative of an intention to acquire a right.

The same rule must be applied when the right claimed is of fishing. There must be an actual disseisin, or exclusion of others, or the user must be accompanied by such circumstances as show that it was hostile to the owner, and that he may be presumed to have known that it is adverse to his rights. I concur in the remark of Thatcher, J., in *Nickerson* v. *Bracket*, 10 *Mass.* 217, that the annual temporary use of a fishing privilege would not avail against a private proprietor of the soil, because it could not amount to disseisin. See *McFarlin* v. *Essex Co.*, 10 *Cush.* 311; *Melvin* v. *Whiting*, 10 *Pick.* 295; *Same* v. *Same*, 13 *Pick.* 184.

And where the claim is not of a several and exclusive fishery, but of a common fishery, as it is in this case, the necessity of requiring circumstances beyond mere user to make it hostile, is the more apparent, because it would be exceedingly difficult, if not impossible, to predicate a disseisin of an user in common with the owner and others, when the fishery is not worked for a pecuniary profit.

The evidence in this case shows that the public in general, for a period of forty years and upwards, were accustomed to fish in the pond in question, without hindrance or molestation, and that permission to do so was neither asked nor granted; that the fishery was never used by its owners, either before or since the plaintiff acquired title, as a source of pecuniary profit; but that every one, without regard to residence or tenure of lands, was permitted to fish in all parts of the pond, at will, and whenever his inclination prompted him to do so; and that this privilege was exercised under a prevalent impression that the fishery, in the language of one of the witnesses, was a free fishery. And it is a noticeable fact in the case, that although the wit-

nesses who fished in the pond testify that they did so under a conviction of their right, yet no one claimed a right personal to himself, or other than such as it was thought belonged to the public in general. This evidence tends merely to establish a customary right, in all the inhabitants and frequenters in that locality, to fish in these waters, if a right to fish could be established by proof of custom. But the right of fishing being a *profit a prendre* in another's soil, as distinguished from an easement, cannot be claimed by custom, but must be prescribed for in a *que* estate. *Blewett* v. *Tregonning*, 3 *A. & E.* 554; *Race* v. *Ward*, 4 *E. & B.* 702; *Bland* v. *Lipscomb*, 20 *Eng. L. & Eq.* 189, *note;* 1 *Saund.* 340 *b*, *n*. 3; *Waters* v. *Lilly*, 4 *Pick.* 145; *Pearsoll* v. *Post*, 20 *Wend.* 111; *S. C.*, 22 *Wend.* 425; *Ackerman* v. *Sharp*, 3 *Halst.* 125; *Wickham* v. *Hawker*, 7 *M. & W.* 63, 78; *Grimstead* v. *Marlowe*, 4 *T. R.* 717; *Gateward's case*, 6 *Coke* 59 *b;* *Perley* v. *Langley*, 7 *N. H.* 233. The defendant cannot justify under a custom, nor will proof of a custom sustain a plea of prescriptive right, because the two rights, though they may co-exist in the same land, are of a completely different nature. *Blewett* v. *Tregonning*, *supra;* *Kent* v. *Waite*, 10 *Pick.* 138, 142. The right the defendant sets up is incident to the ownership and occupancy of the two parcels of land described in his pleas, and to sustain his justification, it must appear that by reason of the adverse use or enjoyment of the right by him or by those whose estate he has, it has become annexed to his lands in such a manner as to be part of the inheritance, and transmissible therewith.

To the Kitchell lot, the defendant makes title under the plaintiff, by virtue of divers mesne conveyances—the plaintiff having conveyed to James Kitchell, on the third of May, 1836, and on the twentieth of February, 1845, the defendant acquired title.

To the Day lot, the defendant makes title under the heirs of Lemuel Cobb, who died seized on the fifteenth of April, 1831, leaving three heirs, of whom the plaintiff was one.

On the 27th of December, 1838, the plaintiff and his sister released their interests to Benjamin Howell, whose wife was also one of the heirs of Lemuel Cobb, deceased. Howell and wife conveyed to David Meeker, on the sixth of March, 1840, and the defendant derived title from Meeker, by virtue of divers mesne conveyances; his own deed bearing date on the twentieth of October, 1863.

It is not claimed that there was a right of fishery annexed to either of these lots, at the time of the respective conveyances to which the plaintiff was a party. Of the intermediate grantees, a number were called as witnesses, as well as several of the tenants who occupied the premises. A careful examination of their evidence discloses merely that, in common with the rest of the community, they fished in the pond, with the knowledge of the plaintiff, without permission, and without objection. None of these owners testify that their fishing was under a claim of right in themselves, as distinguished from the public, or with a view of acquiring a right thereby. So far as appears by their evidence, the user was either permissive, under a recognition of the plaintiff's title, or else in the enjoyment of the privilege that the public had of fishing, without any intention to assert a right by reason thereof. There is nothing in the evidence that would warrant the inference, that at the time the defendant acquired title to the lands, by virtue of which he prescribes for this right, the right was annexed to the lands by prescription, or that any adverse user had commenced which could, by continuance, ripen into an indefeasible right.

Since the defendant has been owner of these premises, he and his servants have, at intervals, fished in this pond, the same as the rest of the public. There was nothing in this user for his own immediate benefit that indicated an intention to assert or acquire a right in himself, or to distinguish it from the privilege enjoyed by the public, or any of the owners or occupiers of lands in the vicinity.

That he, or those under whom he claims, expended money

Cobb v. Davenport.

in building a hotel, and in making improvements to accommodate, for profit, such of the public as might visit the pond for the purpose of fishing, is entirely foreign to the question of his rights of fishing as annexed to his lands. The right prescribed for is properly stated in his plea to be a right, liberty, and privilege to fish for fish in the plaintiff's close, and the fish so caught to take and carry away, and to convert to his own use. If the improvement had been made in order to better enable the occupiers to fish for their own immediate profit, an inference might have been drawn therefrom that they made claim to a right of fishery, because of the improbability of a man's making such expenditures on the faith of a precarious privilege. But the hotel was not built for that purpose, and as evidence of a prescriptive right in the defendant to fish, it is totally irrelevant.

A finding for the defendant, on the issue of the prescriptive right set up, would conclude the plaintiff as to nothing more than the personal right of the defendant, and those who may succeed to his estate in the lands, by themselves or their servants to fish in the *locus in quo*, for his or their immediate profit. It would not conclude the plaintiff as to strangers or the public who might stop at the defendant's house. The prescription relied on is not of a right to have custom at his hotel, but of a right by himself or his servants to fish in the waters of this pond for his private benefit.

If the plaintiff encouraged the defendant, or those under whom he claims, to expend money in building a hotel for public accommodation, by assurances that the fishery should remain open to the public, or the guests at the hotel, whereby custom might be attracted to the house, it might be a ground for an application to a court of equity to restrain the plaintiff from withdrawing such privilege, to the injury of the defendant, but it is no evidence of the right prescribed for in the defendant's pleas.

When a plea, prescribing for a right to the use of this fishery, for the accommodation of the guests at the defendant's hotel, shall be presented, it will be time enough to

consider whether by law a prescription in a private owner of a right of profit in another's lands, to be enjoyed by the public, for his benefit collaterally, can be sustained.

Aside from the testimony on this subject, there is very little evidence to distinguish the defendant's user from that of the public. It was no disseisin of the plaintiff, nor was it, in the assertion of a right in himself as distinguished from that of the public, asserted and exercised by him under such circumstances as might afford an indication to the true owner, that a right was being claimed against him. The evidence was not sufficient to warrant the jury in finding that the user by the defendant, or those under whom he claims, was adverse, and that a right by prescription had been acquired thereby.

It was further insisted that the fishery, though originally private, has been dedicated to the public, and that the acts of the plaintiff, in relation to the user of the fishery by the public, were such as to show an intention to dedicate, and an actual dedication of it to public use, and that the plaintiff is estopped from claiming it as private property. In *Woolrich on Waters, p.* 129, it is said that there seems to be no reason why, if a private owner should permit the public to use his stream indiscriminately, and without hindrance, a dedication should not be presumed, on the same principle as a way may be claimed by the like supposition. He refers to no case in which a right of fishery in private waters, by dedication, has been asserted. My examination of the authorities, and the books of reports, has not brought to my notice a single case in which a right to take the profits of the soil of another, as distinguished from a mere easement, has been claimed under a dedication.

The cases uniformly hold that a right to profits *in alieno solo,* can only be claimed by grant or prescription.

There is no plea in this case raising this question, and it is not necessary to consider it.

As to the estoppel *in pais,* the right is an interest in land, and within the statute of frauds. It, therefore, can-

Cobb v. Davenport.

not *at law* be acquired by parol.   *Den* v. *Baldwin,* 1 *Zab.* 395.

The verdict is contrary to law, and against the evidence, and is set aside, and a new trial granted—costs to abide event.

BEASLEY, C. J., and BEDLE, J., concurred.

CITED in *Trenton Water Power Co.* v. *Raff,* 7 *Vroom* 342; *Foulke* v. *Bond,* 12 *Vroom* 545; *Carlisle* v. *Cooper,* 6 *C. E. Gr.* 596; *Attorney-General* v. *Delaware and Bound Brook Railroad Co.,* 12 *C. E. Gr.* 639.