51 N.J. Super. 545 (1958)
144 A.2d 199
ANITA HAZEK, PLAINTIFF-RESPONDENT,
v.
LAWRENCE GREENE, ET ALS., DEFENDANTS-APPELLANTS. ANITA HAZEK, PLAINTIFF-APPELLANT,
v.
WESTERLY, INC., ET ALS., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 16, 1958.
Decided August 4, 1958.
*546 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. George Gildea argued the cause for defendants-appellants, Lawrence Greene, et als., and for defendants-respondents, Westerly, Inc., et als. (Messrs Katzenbach, Gildea & Rudner, attorneys; Messrs. George Gildea, Gordon D. Griffin and Robert M. Dix, of counsel).
Mr. George Pellettieri argued the cause for plaintiff-respondent and appellant, Anita Hazek (Messrs. Pellettieri & Rabstein, attorneys; Miss Ruth Rabstein on the brief).
*547 The opinion of the court was delivered by FREUND, J.A.D.
The question for determination on these consolidated appeals is whether the plaintiff has successfully proved her claim of easements by prescription over and across the lands of the several defendants for use as bridle paths in connection with the operation of her livery stable and riding academy.
The plaintiff seeks to establish her rights of prescription and to restrain the defendants from interfering with her use. The trial judge found that with respect to the Greene property, also referred to in the record as the Brookstone Development, but originally known and hereafter referred to as the Russell Farm, the plaintiff had established the claimed prescriptive easement, but not so as to the Westerly property, hereafter referred to as the traction company or trolley right of way. The defendants in the Greene suit appeal from the judgment entered against them, and the plaintiff appeals from the judgment in the Westerly suit.
The plaintiff is the owner of a tract of land, consisting of about four acres on Bayard Lane, in Princeton, New Jersey, upon which there is erected a stable large enough to accommodate 30 horses and living quarters, a building containing an indoor riding rink, a cottage, and fences for paddock and jumps. She occupied the premises as a tenant in 1943 and since then has conducted a riding academy under the name of Princeton Riding Club. Horses could be boarded there or hired for riding, and instruction was given in equitation. The plaintiff became the owner of the property on July 19, 1955. While the testimony is in some respects indefinite, it appears that the premises had been used by various tenants for the same purposes as at present at least since 1925.
In July 1955, the defendants Greene and Greenberg purchased 180 acres of land, a part of the "Russell Farm" in Princeton, for building development. The defendant Prentiss is the owner of one of the lots in the development. Part of the property now owned by Greene was formerly part of *548 the Trenton-Princeton Traction Co. right of way acquired about 1901 without condemnation proceedings, and was used for street railway purposes until 1940.
The defendants Westerly, Inc. and others are the owners of lands which were originally owned by Sarah B. Stockton and used for farming purposes. In January 1901 the traction company instituted condemnation proceedings to acquire a strip of her land as a right of way for its high-speed trolley line, the same line aforementioned, which also traversed part of the present Greene tract. The condemnation commissioners awarded Mrs. Stockton $1,384 as the value of the land taken and $3,433 for all other damages. On appeal, the jury awarded her $667.67 for the land and $1,900 for damages.
Trolley line operations were discontinued on October 31, 1940. By deed dated January 31, 1942, the traction company conveyed the trolley right of way to the surviving executors of Sarah B. Stockton, deceased, for a consideration of $50. The deed recites: "This deed is given for the purpose of assuring the grantees that Trenton-Princeton Traction Company now has no further interest in the strip of ground."
With a view to proving the necessary elements of an easement by prescription across defendants' properties, the plaintiff produced witnesses who testified as to the existence and use by horseback riders of riding trails. Riders included tenants of the then owners of the plaintiff's property and their patrons as well as riders from other stables and members of the public having their own horses.
Mrs. Helen Bergen Lawson testified that about 1920 or 1921 she and her then husband, Harvey Bergen, started a business on John Street in Princeton of hiring horses for riding purposes. It was located about six blocks from the riding stables now owned by the plaintiff. She testified that there were logging trails on or near the Russell Farm and that she and her husband cleaned these trails for horseback riding and also cut new ones. She said that their riding patrons started to use the trails about 1929.
*549 About 1932 the Bergens moved their riding business to the site of the plaintiff's present business. They rented the stable from a Mr. Stratton, although they purchased the riding hall from a Mrs. Froelich. Mrs. Lawson testified that she and her husband operated "a public riding stable," and their customers continued to use the bridle paths and trails over and across the Russell Farm and on to other properties. She said that "everybody used to use the same trails out there." Further, there was always a stable where the Hazek stable is presently located, with "plenty of private horses around that used the same bridle paths all the time," in common with the riding public. She repeated that "[e]verybody used the right of way and the trails * * * everyone that owned horses around, private horses or anyone always used those trails," including riders from several other riding stables. The Bergens continued to operate their riding stables until 1940. In the intervening years she saw no signs posted prohibiting the use of the trails; "no one ever said a word," nor did anyone ever give them permission to use the trails. Mrs. Lawson's husband, Mr. Bergen, died in 1940. She continued to operate the stable; in 1942 she sold the business to Robert Stone.
There was testimony of Fred C. Vossler who patronized the riding stables now operated by the plaintiff since 1932 until the present time. When riding he rode over the trolley right of way on both sides of Stony Brook and followed the riding paths over and across the Russell Farm and beyond. He invariably saw other riders, some singly and others in groups of as many as a dozen riders. He denies seeing any signs forbidding the use of the trails nor did any person ever indicate to him that he was not to use the trails. The riding paths, he said, were visible, he had no trouble in finding them and they were clearly spaced. On cross-examination, he said the trails were numerous, over different farms, "covered a great deal of the countryside" and would take hours to ride. When riding along the trolley right of way and a trolley car was approaching, the riders would in some instances leave the right of way to permit the car to pass.
*550 Robert McVeigh testified that he had been a blacksmith in Princeton for 37 years. He had shod horses since 1922, including those horses at the stable where plaintiff's stable is now located. He had walked over the trails on the Russell Farm, as well as those on other properties and seeing horses on the trails that came from stables other than that at the plaintiff's location.
Wilhelm F. Leisner testified that for about a year during 1929 and 1930 he was employed in the capacity of caring for "a string of horses" at the stable where the plaintiff now conducts her business. He stated that patrons were taught how to ride, and he described in detail the trails over the Russell Farm, the trolley right of way and other properties where he said the riders had a choice of different trails. He said the Russell Farm was "honeycombed with trails," and riders would also go over other farms. He acted as the "second whip" for the Stony Brook Hunt Club and said that the trails on the Russell Farm were used for fox hunting by the members of that club. He testified to trails that extended over the Peyton, Ettl, Agle, Edgerstoune and McAlpin Farms. It was the custom in and around Princeton "for people who rode horseback to ride over other people's farms as well as their own." Leisner testified that Mrs. Benson, one of the heirs of the Russell Farm, was a member of the Hunt Club and participated in some of the hunts. Mrs. Benson had a few horses which she boarded at the Princeton Riding Stables. Other horses used in the hunts were hired from the same stables. He testified that someone  he was unable to give the name  in 1941 or 1942 argued with Mr. Stone, who succeeded Mrs. Lawson as a tenant of the stables, about riding over his farm. He heard Stone say he had been "riding over them before and I am going to keep on riding." Leisner testified that he observed signs posted on the Russell Farm which read "Private," "Private Property" and "Keep Off." However, as noted, plaintiff's witness, Vossler, testified he never saw any such signs.
*551 Anita Hazek, the plaintiff, testified that she owns and conducts the business of the Princeton Riding Club, teaching children to ride horses, training horses, and renting horses to the public. She acquired the business in 1943, as already stated, from Stone, who sold her the building containing the indoor ring and other personal property which she alleged included "the right to use the trails." When she purchased the business she saw a sign on the wall of the stable, posted by Mr. Bergen, which read "Miles of woodland bridle paths."
Mrs. Hazek described the main trails leading from her property over the old trolley right of way, across Stoney Brook and onto the Russell Farm and other properties, as well as other trails less frequently used. She testified to having received a letter from the defendant Westerly company prohibiting the use of the former trolley bed as a trail but she refused to stop using it as a bridle path. Miss Sarah B. Stockton, one of the daughters of Mrs. Sarah B. Stockton (who originally owned some of the property where trails were used by riders from the plaintiff's establishment), wanted to be paid for the use of the trails. Mrs. Hazek testified she refused, and that she had said that she understood she had a right to use the trails and was not going to pay for them. She also testified that Tomasi, the caretaker of the Russell Farm, told her that horses were not to go over "his" property and posted signs to that effect. She continued to ride the trails and when the signs were near the bridle paths she "tore them off * * * put them in my pocket and burn [ed] them." The trails were sufficiently extensive to require a ride of about two hours, and to ride all the trails would take three hours. She estimated the trails used in the operation of her business to be from 15 to 18 miles in length.
There was received in evidence the deposition of David H. Stockton, one of the former owners of the land upon which the plaintiff's stable is situated. His deposition disclosed that various tenants rented the stable from about 1919 until the Stocktons sold the property in 1943, and that patrons of the stable were permitted to use the Stockton *552 property. He said he knew that patrons of the stable were "riding around fields," but he did not know they had trails or that riders rode over the Russell Farm or the trolley right of way.
The deposition of Arthur M. Conger, a patron of the stable now owned by the plaintiff, was also made part of the record. He testified that he started to ride from the stables in 1928, and in response to a question asked of him, he said it was common practice to ride over property belonging to other people, as long as it did not disturb cultivated land.
As previously mentioned, part of the easement claimed by the plaintiff is over what was formerly the right of way of the Trenton-Princeton Traction Company, which is part of the property now owned by the defendant Westerly, Inc. and others similarly situated. It had been acquired by the traction company in condemnation proceedings under the provisions of "An Act to Authorize the Formation of Railroad Corporations and to Regulate the Same" approved April 2, 1873, Laws 1873, c. 473, and "An Act to regulate the ascertainment and payment of compensation for property condemned or taken for public use" approved March 20, 1900, Laws 1900, c. 53. The pertinent provision of the act of 1873 is found in section 12:
"* * * the said [railroad] company is hereby empowered to enter upon and take possession of the said lands or materials for the purposes aforesaid * * * to have, hold, use, occupy, possess and enjoy the said land or materials * * *."
John B. Di Cicco and Charles P. South, conductors on the company's trolley line, testified that they worked until the last day of its operation, October 31, 1940, and that they rarely saw any horseback riders on the right of way. Occasionally one would be seen, but upon warning by a loud whistle, audible at a great distance, the rider would leave the track. The two worked on varying "shifts" and were able to observe trespassers at different times of the day.
Upon all the facts the trial judge, as noted, held that the plaintiff had succeeded in proving the necessary elements of adverse user to establish an easement by prescription over *553 the former Russell Farm. He declined to rule that a similar easement was acquired by the plaintiff in the land now owned by Westerly and others formerly used by the traction company, which the latter acquired by condemnation, upon the theory that the traction company had only a fee simple determinable in the land which reverted to the Stockton heirs upon the cessation of use for a railroad, and therefore any adverse use was not operative against the reverter's interest in the land.
The questions presented upon this appeal by the litigants are many, but in our opinion the entire matter can be resolved by a determination of whether the basic issue has been proved  that of adverse user for 20 years.
A claim of an easement by prescription depends upon the establishment of certain elements predicated on an analogy to the statutes of limitation concerned with adverse possession of land. Cobb v. Davenport, 32 N.J.L. 369, 385, 387 (Sup. Ct. 1867); Plaza v. Flak, 7 N.J. 215, 219 (1951). There must be a use of the land that is adverse, hostile, exclusive, continuous, uninterrupted, visible and notorious. Cobb v. Davenport, supra, 32 N.J.L. at page 385; Plaza v. Flak, supra, 7 N.J. at page 220; Baker v. Normanoch Ass'n, Inc., 25 N.J. 407, 419 (1957).
The basic problem with which we concern ourselves is whether the use made by the plaintiff and the patrons of her facilities, and by the predecessor owners of the stable and their patrons, was adverse and hostile. For the purposes of this discussion, we will assume, arguendo, that the plaintiff can tack to her own use the prior use made by predecessor stable owners, and that no issue exists concerning the question of whether such an easement can exist in gross as an incident of the ownership of the riding stable without reference to the ownership of the land.
Adversity and hostility are states of mind and generally in easement cases where these elements are being proved, reliance must be placed upon outward manifestations of the mental processes of the persons claiming the easement and the ones against whom it is claimed. This is primarily a *554 fact problem, difficult of proof. The law has, however, by enunciating certain presumptions derivative from general fact situations, removed some of the proof requirements.
These principles were set forth in Plaza v. Flak, supra (7 N.J. at page 222), recently repeated in Baker v. Normanoch Ass'n, Inc., supra (25 N.J. at page 420) as follows:
1. The person claiming the easement by prescription has the burden of sustaining the claim of adverse use.
2. When the party claiming such a right shows open, continuous, uninterrupted, exclusive use for the prescriptive period with the acquiescence of the owner of the servient estate, the initial burden of proof has been satisfied, and a presumption arises that the use was adverse. The burden of rebutting this presumption is then cast upon the opposing party, although upon the entire case the claimant must still establish the prescriptive easement by a preponderance of the evidence.
3. Where the land and the uses thereof are such that the property is classified as vacant, unimproved land, unenclosed, and the use is casual rather than customary, then the use is presumed to have been permissive, not adverse.
The third rule above referred to is not applicable here since part of the land appears to have been improved and the uses relied upon by plaintiff were customary rather than casual. However, it is our opinion that the presumption of adversity mentioned in the second paragraph, if applicable here by reason of 20 years of open and continuous use by the plaintiff and her predecessors, is refuted by the facts (1) that the riders out of plaintiff's location rode not only over the property in question but over extensive other lands and (2) that there was a general customary use of this and other open lands in the area by riders in general.
The picture developed by the entire scope of the evidence is one of so general a custom of indiscriminate use of the various trails on this and other properties in the vicinity as to repel the conclusion that the intent of any particular group or individual riding these trails was to claim a right of user hostile and adverse to the owners. The record indicates *555 that at least one of the Russell heirs, Mrs. Benson, participated in fox hunts on her own property, a fact pointing to permissive use by that group, and most probably by others. Testimony showing a contrary attitude upon the part of the owners of the Russell property  i.e. that the use of the trails was not permissive  is that of Wilhelm Leisner who testified that "Private Property" signs were posted there, and the testimony of the plaintiff and her sister concerning the several episodes showing hostile actions on the part of persons owning or in charge of various properties, including the Russell Farm. (Plaintiff's testimony related to what happened after 1943, and Leisner's testimony related to a period after 1929. This falls short of establishing the required 20-year period.)
The extensiveness of the trails, estimated roughly by the plaintiff as being 15 to 18 miles and described by some riders as extending to Lawrenceville, also points to the conclusion that the intent of the property owners and the trespassing riders from the various stables and riding clubs was permissive rather than hostile. Had the plaintiff argued that her supposed rights extended to the full length of all the trails used by her riders in the vicinity, the baselessness of any inference that the prescriptive easement extended to the entirety thereof would be obvious. The fact that plaintiff limits her claim in this action to only a portion of the network of trails does not take away the indelible stamp of intent that more probably existed with regard to the situation in its entirety. There is no basis in the evidence for inferring a different intent by the owners of the stable in respect to the use of the defendants' properties from that in the use of the entirety of the areas ridden.
In relying, in part, upon the circumstance that the tracts in question were used by the general horse-riding public, we are not ruling on the basis of the absence of the element of "exclusiveness" of the use in the claimant, as such.
The authorities have generally said that the individual acquisition of a right of way by prescription is impossible where the same use has been "indiscriminately" exercised by *556 the general public, on the theory that this prevents the claimant's use from being "exclusive" within the meaning of that word in the formula laid down for acquisition of prescriptive rights. Poulos v. Dover Boiler & Plate Fabricators, 5 N.J. 580, 588 (1950). Annotation 111 A.L.R. 221 (1937); 17A Am. Jur., Easements § 82, p. 698 (1957). However, this element of exclusiveness, which, on its face, would seem to exclude prescriptive easements merely because the general public as well as plaintiff has used the way, has been explained to mean only that the claimant must not be depending, in establishing his claim, upon the similar rights in others and it has been stated that a claimant need only show something indicating that his use was "distinctive," notwithstanding similar use by others. City of Derby v. Di Yanno, 142 Conn. 708, 118 A.2d 308 (Sup. Ct. Err. 1955); Annotation 111 A.L.R., supra, at pages 223-224; 17A Am. Jur., ubi. cit., supra.
Our cases have not articulated the foregoing distinction, but have only recited the general proposition that where the use is "as a member of the public" there is no exclusiveness and no accrual of prescriptive rights. See Poulos v. Dover Boiler & Plate Fabricators, supra; DeLuca v. Melin, 103 N.J.L. 140, 144 (E. & A. 1926); but see Bioletti v. Sindoni, 135 N.J. Eq. 609, 616 (Ch. 1944). The leading case is Cobb v. Davenport, supra, where the claimed prescriptive easement was to fish in a certain pond. The evidence was that members of the public generally fished in the pond wherever they so desired for more than 40 years. The court held there was no prescriptive right in the plaintiff and said:
"* * * where the claim is not of a several and exclusive fishery, but of a common fishery, as it is in this case, the necessity of requiring circumstances beyond mere user to make it hostile, is the more apparent, because it would be exceedingly difficult, if not impossible, to predicate a disseisin of an user in common with the owner and others, when the fishery is not worked for a pecuniary profit." (32 N.J.L., at page 388)
It is also significant that the court in Cobb remarked, in the next paragraph, that it was a "noticeable fact" that "no *557 one claimed a right personal to himself, or other than such as it was thought belonged to the public in general." (32 N.J.L., at pages 388-389) The basis of the case is apparent. Were the claimants those who had exercised a right in a personal sense, e.g., had they been conducting some commercial enterprise depending on fishing rights, they might not have been regarded as doing so as members of the public generally. Similarly, a careful reading of Poulos reveals that the reference is to user "as a member of the general public."
In the instant case, we recognize that the plaintiff's claim is not predicated upon her use and her predecessors' use as a member of the general public, but rather as an adjunct of a private commercial enterprise. The plaintiff in her proofs does not rely upon "similar rights in others." That others had likewise made use of the trails does not ipso facto defeat her rights, providing she establishes the requisite use personal to herself. It is in this latter regard that the plaintiff's case is deficient, and our emphasis upon the concomitant general public use is merely one factual element, but a significant one, tending to indicate that the intentions of the various tenants of the stables was merely to partake of the use being made by horsemen generally of the locus in quo and surrounding lands. Taken together with the fact that the riders out of the stables on this property were riding indiscriminately over many other lands and farms besides that of the present defendants, the factual conclusion that the use was not hostile or with any intent of claim of right of title is irresistible.
What we have already stated applies with equal force to that portion of the bridle path over the former right of way of the traction company. The trial judge, however, ruled in favor of Westerly and the other defendants similarly situated, upon the ground that under section 12 of the General Railroad Act of April 2, 1873, the condemning railroad corporation "could only acquire that interest which [was] necessary for railroad uses and once the railroad uses and purposes were given up, the land reverted to the Stocktons." *558 Therefore, any adverse use acquired against the traction company did not run against the Stockton heirs. Cf. Content v. Dalton, 121 N.J. Eq. 391, 405 (Ch. 1937), affirmed 122 N.J. Eq. 425, 439 (E. & A. 1937).
The law is clear that a fee simple title may be acquired by condemnation if the statute authorizing the taking so provides. Currie v. New York Transit Co. and the National Docks Ry. Co., 66 N.J. Eq. 313 (E. & A. 1904); Valentine v. Lamont, 13 N.J. 569, 578 (1953) affirming 25 N.J. Super. 342 (App. Div. 1953). In Currie, the court was concerned with the statute under consideration herein and it was there stated that the condemning railroad acquired "the land, itself" and not merely an easement. Consequently the person from whom the land was condemned had no standing to enjoin an unauthorized use. The court did not purport to determine whether the estate thus acquired was a fee simple determinable or a fee absolute, although some of the language would seem to favor the former.
Our reading of the pertinent portion of section 12 of the act, set out above, indicates that the traction company acquired no more than a fee simple determinable, and that upon the cessation of use for railroad purposes, the title reverted to the heirs of Sarah B. Stockton from whom the property had been acquired. Cf. Summerill v. Hunt, 25 N.J. Misc. 498 (Sup. Ct. 1947). Thus, any rights that were in the process of vesting against the traction company were necessarily cut off by the reverter, and the prescriptive period had to start running from the time title reverted. Since the railroad was abandoned in 1940 and this action instituted in 1956, plaintiff did not have the 20-year adverse period needed to make a case against the property owned by Westerly and its co-defendants.
But even without this consideration, the plaintiff cannot prevail as against the owners of the Westerly property. The evidence clearly discloses that any use made by the plaintiff's predecessors of the railroad right of way was not adverse to the traction company, but subordinate thereto. The *559 testimony is undisputed that whenever the trolleys traversed this portion of the countryside, the riders would leave the trolley bed for their own safety. The testimony of the exmotormen indicates that they rarely saw horseback riders. This evidence demonstrates a permissive rather than an adverse use, and thus precludes the determination that any prescriptive rights could arise as against Westerly and the other defendants similarly situated.
With regard to that portion of the abandoned trolley right of way running across the Russell tract, we note that the traction company acquired this land by grant from the then owner of the fee. Thus, the issue concerning the type of estate and its consequence has no effect in our conclusion as to that property. However, the other general observations we have made above about the nature of the use of the right of way are pertinent. Additionally, Mrs. Lawson, owner of the riding stable from 1938 to 1942, testified that this trail was never used by her customers, and that she knew of no such use. Therefore, any use by individual customers could not inure to the benefit of the riding stables, as such use could not be with an intent to assert any adverse right. This fact negatives one of the essential elements of prescriptive adverse user, namely that it be continuous over the 20-year period, and would constitute another basis for the defeat of the plaintiff's claim as to this portion of the trails.
We therefore hold that the plaintiff has no prescriptive rights in any of the trails on the properties of the various defendants.
The judgment in Hazek v. Greene and others is therefore reversed, and the judgment in Hazek v. Westerly, Inc. and others is affirmed.
GOLDMANN, S.J.A.D., concurs in the result.