HARRY CONTENT, complainant-appellant,

*v.*

ROBERT H. DALTON et al., defendants-respondents.

[Argued May 25th, 1937.   Decided September 22d, 1937.]

*Mr. Robert H. McCarter* and *Messrs. Leavitt & Talley,* for the complainant-appellant.

*Mr. James Raymond Berry* and *Messrs. Lum, Tamblyn & Fairlie,* for the defendants-respondents.

The opinion of the court was delivered by

CASE, J.

This is on bill to quiet title.   Chancery decreed that each of the three defendants who appear as respondents herein has an undivided vested remainder interest in the property,

subject to the life estates of two life tenants. The appeal is from that determination and from the award of costs and of counsel fee in the amount of $500 against the complainant.

Robert J. Dalton died January 10th, 1889, seized of certain lands at Goose Neck, abutting the Shrewsbury river, in Monmouth county. His will, probated June 21st, 1889, contained provisions which the court of chancery construed as a devise in fee-tail to the testator's daughters, Rosamond Reynolds and Mary Ella Beattie. Having so found, the court further determined that, under sections 10 and 11 of our statute of descent, *2 Comp. Stat. p. 1921* (first enacted June 13th, 1820, page 178, *P. L. 1819-1820, 1820 Rev. & Comp. p. 774*) an estate for life went to the daughters with remainder in fee to their children. Appellant does not now dispute that construction. Mrs. Reynolds and Mrs. Beattie still live. Mrs. Reynolds has one child. Mrs. Beattie has six children. The respondents, claimants as *pro rata* remaindermen, are three of Mrs. Beattie's children, born, respectively, in 1893, 1895 and 1897.

On June 1st, 1900, Mrs. Reynolds and Mrs. Beattie, for valuable consideration, and believing that they were the owners, executed and delivered to their brother, Leon Dalton, a deed of full warranty for the premises. Leon lived there from that time until his death in 1916 or 1917, having meanwhile caused bargain and sale deeds to be executed out from him and his wife to a third person and from that person back to Leon's wife, Mary. Mrs. Leon Dalton continued to reside on the premises until 1919, at which time she executed and delivered a deed of full warranty to Mrs. Mary Bishop Shera. Mrs. Shera remodeled and modernized the house, slightly changed its location, caused or permitted the highway to traverse the property at a different location, and on March 4th, 1935, conveyed the major portion of the property to complainant by warranty deed. There is no proof that any facts of disseizin or of adverse possession were brought home to the respondents.

Appellant bases his alleged rights against the respondents entirely upon the preamble and first section of the act

entitled "An act for the limitation of suits respecting titles to land," passed June 5th, 1787. *Paterson's Laws 81; 3 Comp. Stat. p. 3172 pl. 28,* as amended by chapter 188, *P. L. 1922.* The amended section 1 is as follows:

"Thirty years' actual possession of any lands, tenements, or other real estate, excepting woodlands or uncultivated tracts and that sixty years' actual possession of any woodlands or uncultivated tracts, uninterruptedly continued by occupancy, descent, conveyance or otherwise, in whatever way or manner such possession might have commenced, or have been continued, shall vest a full and.complete right and title in every actual possessor or occupier of such lands, tenements, or other real estate, and shall be a good and sufficient bar to all claims that may be made, or actions commenced by any person or persons whatsoever, for the recovery of any such lands, tenements, or other real estate."

The change made by the amendment (see the original statute, *infra*) is that the period of limitation was changed from sixty years to thirty years except as to woodlands or uncultivated tracts.

The gist of appellant's argument, as we understand it, is, first, that possession under the statute need not be adverse, but, second, that if it need be adverse then an adverse possession set up during the period of the life tenancy will toll against the remaindermen and that possession adverse to, and effective to bar the claim of, the remaindermen was in fact established by the delivery and recording of the deeds, *supra,* followed by an open and notorious occupancy such as the evidence discloses; and finally, that the statutory reduction of the period of limitation from sixty to thirty years is not unconstitutional as to the respondents.

We are not dealing with tenants in tail or with issue in tail. The 1784 statute (*Pat. 53*) modified but preserved the system of entails; the legislature intended, by the statute of descents, *supra,* as was said by Mr. Chief-Justice Beasley in *Redstrake* v. *Townsend, 39 N. J. Law 372, 379,* "to eradicate the entire system." Our subjects, even if they be called tenants in tail and issue in tail, have the incidents of life tenants and remaindermen; and judicial expressions bearing upon the rights and liabilities of tenants in tail and issue in

tail, as such, as in *Spottiswoode* v. *Morris and Essex Railroad Co., 61 N. J. Law 322; affirmed, 63 N. J. Law 667; Wright* v. *Scott, 4 Wash. C. C. 16,* and *Croxall* v. *Shererd, 72 U. S. (5 Wall.) 268; 18 L. Ed. 572,* are not controlling. The legal attributes of these several sets of interests are quite different. Even when estates in tail were recognized by law, there might still be a remainderman to take on the failure of issue in tail; and the issue in tail took through his ancestor, in whose body, so to speak, he was bound up, but a remainderman took, even as he now takes, from the devisor or him who created the interest. Moreover, the statute of 1787 was not pertinent to the *Spottiswoode Case* (see page 329 of the supreme court opinion); the *Croxall Case* turned upon a deed delivered in 1793 creating estates tail and a special act passed in 1818; in *Wright* v. *Scott* it was said of our section 1 that "it will readily be admitted that the possession under this law must be adverse."

*3 Bl. 196* says:

"The possession of lands in fee-simple uninterruptedly for three score years is at present a sufficient title against all the world and cannot be impeached by any dormant claim whatsoever."

What Mr. Blackstone referred to by "dormant claim" is not clear; and the text is to be read along with Christian's comment that:

"This is far from being universally true; for an uninterrupted possession of sixty years will not create a title where the claimant or demandant had no right to enter within that time; as where an estate in tail for life or for years continues above sixty years, still the reversioner may enter and recover the estate; the possession must be adverse, and Lord Coke says, 'it has been resolved that although a man has been out of possession of land for sixty years yet, if his entry is not tolled, he may enter and bring any action of his own possession; and if his entry be congeable, and he enter he may have an action of his own possession.' (4 Co. 11b.)"

Mr. Justice Elmer, passing (in the supreme court) on the second section of the 1787 statute, in *Pinckney and Bruen*

v. *Burrage and Stephens, 31 N. J. Law 21,* gave a temperate
and sensible review of both sections, wherein he said:

"The principle upon which statutes of limitation are justi-
fied is, that it is for the interest of society to require persons
having claims to prosecute them within a reasonable period.
To bar and preclude those who have no right to prosecute
would in most cases be unjust. It was held, in the case of
*Murray* v. *East Ind. Co., 5 Barn. & Ald. 204,* that the statute
did not begin to run until there was an administrator capable
of suing. The possession that will bar a right of entry has
always been held to be a strictly adverse possession, that is
to say, adverse to some claimant who had a present right of
entry. * * * So long as estates in remainder or reversion
are permitted to exist, they must be protected by allowing a
claimant a reasonable time after his right accrues to com-
mence his action."

The writer of the opinion conceded that the first section
may "possibly" have been framed to run against a remain-
derman without opportunity to him to protect his estate, but
we apprehend from the course of the argument that he did
not entertain the view that it was so framed.

If there be a decision in our books holding that the posses-
sion need not be adverse, neither the diligence of counsel nor
our own study has discovered it. *Model Plan Agency* v.
*Diamond, 101 N. J. Eq. 786,* does not so hold. *Eckhouse*
v. *Berwyn Estates, 106 N. J. Eq. 485,* a chancery decision
which followed in its wake, does not. In *Conaway* v. *Daly,
106 N. J. Law 207,* the defendant's predecessor in title, in
whom defendant grounded his occupation, entered under an
agreement to purchase at a date wherefrom the statutory
period would be complete, and "his possession straight-way
became adverse as against everyone save his grantor." In
*Gordon* v. *Lumberville Delaware Bridge Co., 108 N. J. Law
261,* the following sentence (at *p. 263*), shows that the theory
upon which the decision went is in entire harmony with our
present opinion:

"Statutes of limitations are statutes of repose, enacted as a
matter of public policy to fix a limit within which an action

must be brought, and are intended to run against those who have been neglectful of their alleged rights and have failed to use reasonable and proper diligence in the enforcement thereof."

In *Miller* v. *Penna.-Reading Seashore Lines, Inc., 117 N. J. Law 152,* the holding was to reverse a directed verdict because there were facts for a jury, as of course there would be where actual possession was an issue and was in dispute under the evidence. If the determination in *Carr* v. *Banghart, 112 N. J. Law 324,* is at all pertinent, it is *contra* rather than *pro* the appellant's contention.

True, the statute does not specify that the possession shall be adverse, but neither does the twenty-year statute (*3 Comp. Stat. p. 3169 § 16*), passed in 1799 (*Elm. Dig. 317*), under which it has been considered from the very beginning that possession, to make title, must begin, and continue for the whole term, in hostility (*Den, Van Wickle* v. *Alpaugh, 3 N. J. Law \*446*); nor the second section of the 1787 statute, in passing upon which the *Pinckney* opinion, *supra,* held that the possession that will bar a right of entry must be adverse to some claimant who had a present right of entry. It was the view of Mr. Justice Donges, when circuit court judge, that "actual possession" under section 1 "must be both hostile and adverse." *Smith* v. *Kane, 49 N. J. L. J. 304.* Adverse qualities were assumed in disposing of the issues in *Hummer* v. *Buerk, 90 N. J. Eq. 97; Vierow* v. *Frommann, 107 N. J. Eq. 230,* and *Osterweil* v. *Newark, 116 N. J. Law 227.* Mr. Chief-Justice Marshall said in *Kirk* v. *Smith, 22 U. S. 241* (at *p. 288*); *6 L. Ed. 81* (at *p. 92*):

"One of these (viz., rules which apply to acts of limitation generally), which has been recognized in the courts of England, and in all others where the rules established in those courts have been adopted, is, that possession, to give title, must be adversary. The word is not, indeed, to be found in the statutes; but the plainest dictates of common justice require that it should be implied. It would shock that sense of right which must be felt equally by legislators and by judges, if a possession which was permissive, and entirely

consistent with the title of another, should silently bar that title. Several cases have been decided in this court, in which the principle seems to have been considered as generally acknowledged; and in the State of Pennsylvania particularly, it has been expressly recognized. To allow a different construction, would be to make the statute of limitations a statute for the encouragement of fraud—a statute to enable one man to steal the title of another by professing to hold under it. No laws admit of such a construction. The true question then is, whether the occupancy of those who held under these conditional warrants, was consistent with, or adversary to, the title of the proprietaries."

Much of that language was quoted and approved by Mr. Chief-Justice Depue for this court in *Colton* v. *Depew, 60 N. J. Eq. 454, 461.*

If no adversary element were essential, a devise to one for life with remainder to another would automatically vest the fee in the life tenant, with nothing to the remainderman, provided the life tenant should live and, either in person or by assignee, should possess for thirty years. It is not to be assumed that so revolutionary a change in land titles, so widely to be felt, would be purposely accomplished by indirection.

The reversioners have neither possession nor the right of possession; but they have a vested remainder in fee. Such was the view expressed for this court in *Demarest* v. *Den, ex dem. Hopper, 22 N. J. Law 599,* and many years later for the court of chancery by Chancellor Magie in *Holme* v. *Shinn, 62 N. J. Eq. 1.* In 1922, the possession of the life tenants and their grantees had continued for thirty-three years, with twenty-seven years yet to run before possession would mature into title. Then came the 1922 amendment, which contains no saving clause. If the amendment was retrospectively effective to shut out the vested remainder upon thirty years' non-adverse possession, it did so *instanter,* without an opportunity for the remaindermen to make contest with the parties in actual possession. It is doubtful whether there was at the time even an appropriate form of action

whereby respondents might have presented their claims. It is essential that all statutes of limitation which affect existing rights shall allow a reasonable time after they take effect for the commencement of suits. *Warshung* v. *Hunt, 47 N. J. Law 256; affirmed, 48 N. J. Law 613.* Courts are loath to give a statute retrospective operation where to do so would work injustice to anyone. *Den, ex dem. Berdan* v. *Van Riper, 16 N. J. Law 7, 14; Williamson* v. *New Jersey Southern Railroad Co., 29 N. J. Eq. 311, 333.* For other and kindred views expressed in our law and equity courts see *Bretthauer, Adm'r,* v. *Jacobson, 79 N. J. Law 223; Wittes* v. *Repko, 107 N. J. Eq. 132,* and *Walker* v. *Bennett, 107 N. J. Eq. 151. Conf. Bigelow* v. *Bemis, 84 Mass. 496.* The statute under review, in addition to raising a bar against outstanding interests, undertakes to "vest a full and complete title" in those in whose favor it runs. It seems unjust that a vested right should be taken from one, without payment to him and without opportunity for him to be heard, and conferred upon another.

But we are satisfied that the 1922 legislature did not intend to create, and had no thought that it was contributing to, such a legal situation. Consider the application: Section 2 was designed for a possession of more creditable beginning than was section 1. It applies only to such possession as was founded upon a proprietary right, duly laid thereon and recorded according to law or—and this embraces the facts of the present case—was obtained by a fair, *bona fide* purchase of the lands of persons in possession, and supposed to have a legal right and title thereto. One would expect the possession with the better authenticated origin to be given preference. Under the first section, possession may have begun in any way or manner whatsoever; yet, so we are told, it will ripen into title in the same number of years as would possession under the second section, unburdened by any of the savings imposed upon the latter. The possession of Leon Dalton was obtained June 1st, 1900, by a fair, *bona fide* purchase of the lands from the sisters who were in possession and were supposed to have a legal right and title, and, under mesne

conveyances, the possession of appellant's predecessors (*Day* v. *Kingsland, 57 N. J. Eq. 134*), was uninterruptedly continued. No reason is advanced why that does not bring the status of the possession, as of 1900, under section 2. But possession under section 2 must be adverse and does not run against the remainderman until the death of the life tenant. *Pinckney* v. *Burrage, supra.* Whether for this or some other reason, section 1, exclusively, is relied upon. If that procedure be sound, then there is a premium upon inferiority of title. Appellant, in a supplemental memorandum, says this:

"Finally, counsel argued that the thirty years began to run in 1889, and had expired in 1922. This is an obvious error. No one suggests there was any act by the interested parties, expressive of the idea that the two daughters had anything more than life estates, until their warranty deed to Leon on June 1st, 1900, and it is from that date the statute commenced to operate."

That assertion is wholly inconsistent with the argument that the possession need not be adverse and is, in effect, an admission that it must be. No one but the sisters and their grantees on down the line was in possession from 1889 forward.

We find that the possession must be adverse. To what extent adverse is another question; but, to borrow from the *Kirk* opinion, *supra,* possession which is permissive and consistent with the title of another should not silently bar that title.

The 1787 statute may be better understood if viewed in the light of earlier legislation. At the 1727-1728 session, in the first of George II, the provincial assembly passed an act entitled "An act for the limitation of actions, and for avoiding suits in law" (*Kinsey 211*), which, although apparently passed February 10th, 1728, is usually referred to as the statute of 1727. It provides:

"For Quieting Mens Estates, and avoiding of Suits, Be it Enacted by the Governor, Council and General Assembly of this Province, and it is hereby Enacted by the Authority of the same, That all the Statutes now in Force in that Part of Great Britain called England,

concerning the Limitation of Actions real and personal, shall, and are hereby declared to be in Force in this Province, from the Publication hereof, as fully and effectually as if every of them were herein at Length repeated and Enacted, any Law, Usage, or Custom to the contrary in any wise notwithstanding."

Allinson prints the same statute at page 72 and as a footnote gives the material parts of the statutes of England which are "meant and intended" by the 1727 statute. Four sets of statutes are there set out. Of these, the second, which is the thirty-first of Elizabeth, chapter V, and the fourth, which is the fourth and fifth Anne, chapter XVI, are not pertinent. The first is the thirty-second of Henry VIII, chapter II, passed in 1541, which provides *inter alia* a sixty year limitation upon making title or claim to lands and tenements. In section 8 it provides that if any person or persons be "now within the age of twenty-one years" or handicapped by other named disability he shall have six years after he "shall accomplish the age of one and twenty years," &c., to bring his action; and in sections 9 and 10 it provides further relief, upon conditions, for persons under certain disabilities. The third, the twenty-first of James I, chapter XVI, relates, in part, to the writ of formedon, an ancient writ in the nature of a writ of right provided for those interested in an estate tail who were likely to be defeated of their right by a discontinuance of the estate tail (*Bouvier's Law Dictionary*), and has, for the benefit of persons under disability, a saving clause so strikingly like that in section 2 of our 1787 statute that we here set it out:

"That if any Person or Persons that is or shall be entitled to such Writ or Writs, or that hath or shall have such Right or Title of Entry, be or shall be at the Time of the said Right or Title first descended, accrued, come or fallen, within the Age of one and twenty-Years, Feme-Covert, Non Compos Mentis, imprisoned, or beyond the Seas; that then such Person and Persons, and his and their Heir and Heirs, shall or may notwithstanding the said twenty Years be expired, bring his Action, or make his Entry, as he might have done before this Act; so as such Person and Persons, or his or their Heir and Heirs, shall within ten Years next after his and their full Age, Discoverture, coming of sound Mind, Enlargement out of Prison, or coming into this Realm, or Death, take Benefit of and sue forth the same, and at no Time after the said Ten Years."

Sections 1, 2 and 5 of the 1787 statute (section 1 of which, as amended in 1922, appellant relies upon, *supra*) are as follows; they are given as they appear at pages 81 and 82 of *Paterson,* except that we have italicized the word "times" in the two instances where it occurs:

"I. *Be it enacted by the Council and General Assembly of this state, and it is hereby enacted by the authority of the same,* That sixty years actual possession of any lands, tenements or other real estate, uninterruptedly continued by occupancy, descent, conveyance or otherwise, in whatever way or manner such possession might have commenced or have been continued, shall vest a full and complete right and title in every actual possessor or occupier of such lands, tenements or other real estate, and shall be a good and sufficient bar to all claims that may be made or actions commenced by any person or persons whatever, for the recovery of any such lands, tenements or other real estate.

"II. *And be it further enacted,* That thirty years actual possession of any lands, tenements or other real estate, uninterruptedly continued as aforesaid, wherever such possession commenced, or is founded upon a proprietary right, duly laid thereon, and recorded in the surveyor-general's office of the division in which such location was made, or in the secretary's office, agreeably to law, or wherever such possession was obtained by a fair *bona fide* purchase of such lands, tenements or other real estate, of any person or persons whatever in possession, and supposed to have a legal right and title thereto, or of the agent or agents of such person or persons, shall be a good and sufficient bar to all prior locations, rights, titles, conveyances or claims whatever, not followed by actual possession as aforesaid, and shall vest an absolute right and title in the actual possessor and occupier of all such lands, tenements or other real estate. *Provided always,* That if any person or persons, having a right or title to lands, tenements or other real estate, shall, at the time of the said right or title first descended or accrued, be within the age of twenty-one years, feme covert, non compos, imprisoned, or without the United States of America, then such person or persons, and his and their heir and heirs, may, notwithstanding the aforesaid *times* are expired, be entitled to his or their action for the same, so as such person or persons, or his or their heirs, commence or sue forth his or their action within five years after his or their full age, discoverture, coming of sound mind, enlargement out of prison, or coming within any of the United States, and at no time after. *And provided also,* That any citizen or citizens of this or any other of the United States, and his or their heirs, having right or title to any lands, tenements or other real estate within this state, may notwithstanding the aforesaid *times* are expired, commence his or their action for such lands, tenements or other real estate, at any time within five years next after the passing this act, and not afterwards.

\*      \*      \*      \*      \*      \*      \*

"V. *And be it further enacted*, That so much of the act, entitled, 'An act for the limitation of actions, and for avoiding of suits,' and such and so many of the statutes in England, now in force in this state, as are affected by and repugnant to this act, be, and the same are hereby repealed, made void and of no effect."

The similarity between the quoted portion of twenty-first James I and the *provisos* in section 2 of the 1787 statute suggest that one was the model for the other; this, even if it be, as stated in *Den, ex dem. Johnson* v. *Morris, 7 N. J. Law* \*6, *11*, that our colonial courts held that the twenty-year limitation of twenty-first James I was not within the purview of the act of 1727. These *provisos*, it will be noted, were complete sentences separate and distinct from the context. The logic of them is as pertinent to the first section of the statute as to the second; we think more so. Although the sentences appear in the second section and are without a separate paragraph marking, each contains the words "the aforesaid *times*"—in the plural—and there are no "times" antecedent to that expression except the time of sixty years mentioned in the first section and the time of thirty years mentioned in the second section. All of which carries the implication that, notwithstanding the paragraph formation, the *provisos* were intended to apply to the first section equally with the second; particularly so since otherwise there were no saving clauses whatsoever as to the first section. The same sentence construction was preserved through the various compilations down to and in *Elm. Dig. 314*. But beginning with the 1847 Revision, page 652 (although this statute was not revised) the printers have changed the punctuation. Periods have been replaced by semi-colons and capital letters by those from the lower case, with the result that the *provisos* now appear to be merged with, and physically a part of, the sentence which relates, in section 2, to the original thirty-year limitation alone. *3 Comp. Stat. p. 3172*. It has been said by our courts that neither of these sections conflicts with or modifies the other (*Spottiswoode* v. *Morris and Essex Railroad Co., supra; Model Plan Agency* v. *Diamond, supra*), but these remarks were not, we think, essential to the reasoning which led to

the conclusions, were not made with respect to the clauses which we have been discussing, and in any event do not alter the historical setting.

The indications are that those who passed the statute in 1787 intended to give a time beyond the date of enactment within which all persons subjected to limitation in their rights of action might bring suit and, further, an opportunity for those who were then or should thereafter be under a disability to bring action within a reasonable time after the removal of the disability. Mr. Justice Elmer remarked in the *Pinckney Case, supra,* that the statute, being an act for the limitation of suits respecting title to land, should be interpreted to harmonize with the provisions of other acts for the same purpose, and Vice-Chancellor Green in *Hall* v. *Otterson, 52 N. J. Eq. 522* (at *p. 533*) ; *affirmed, 53 N. J. Eq. 695,* in the application of that principle and with citation of the *Pinckney Case* held that under the twenty-year statute, 1877 Revision, page 597, sections 16, 17 (*3 Comp. Stat. p. 3169*), the limitation did not run against a remainderman until the death of the life tenant.

Appellant and his predecessors in title, Shera and the Leon Daltons, did apparently hold adversely to the life tenants, if a holding and an occupancy in direct compliance with the terms of a vendor's deed may be said to be in this sense adverse to the vendor. The deed from the sisters conveyed what they had; no more. *Middleton* v. *Dougherty, 46 N. J. Law 350; Den* v. *Crawford, 8 N. J. Law *90, 108.* The possession was, of course, adverse to any continuing right of the life tenants to re-enter; but we find that a possession adverse to a life tenant is not *per se* adverse to a remainderman.

Appellant proceeds to argue, however, that the deeds of bargain and sale with full warranty, including declarations of seizin and right to convey, followed by such open and notorious possession as the evidence in the case displays, amounted to a disseizin of the remaindermen, of which they were charged with notice; and the argument is made to rest upon *Foulke* v. *Bond, 41 N. J. Law 527.* The 1787 statute

does not direct whether or not a possession begun during the existence of an estate for life may count during that lifetime against a reversioner or remainderman; but the negative of that proposition as to section 2, even where the possession was for the statutory period and was obtained by a fair and *bona fide* purchase from a person in possession, supposed to have a legal right to title to the land, was held by the supreme court in the *Pinckney Case.* We shall not attempt an analysis of the relationship which a remainderman holds to the seizin where there is a life tenant, both taking from the same donor; but we perceive a real distinction between an alleged disseizin of a remainderman by a life tenant and a disseizin of one tenant in common or his grantees against another tenant in common, the situation which was passed upon in *Foulke* v. *Bond;* and, with respect to physical manifestations on the property, we perceive an equally marked difference between the clear acts of undivided dominion manifested in the cited case and the quiet continuance of mere possession and the recognized rights of a life tenant which existed in the instant case until 1919. Where adverse possession is relied upon to establish title or to bar the claim of the true owner, it is necessary to consider the character, not merely of the actual possession, but of the possession to which the possessor was of right entitled, and, beyond that, of the possession, if any, to which the disseized party was entitled. For only by a due regard for these elements may it be justly decided whether the occupancy of the disseizor has indeed been accompanied by such open and notorious acts of ownership, over the necessary period, as to constitute adverse possession. Adversary action is not an absolute term. It, or more properly the evidence by which it is to be proved, takes color from the relative rights and positions of the parties. It was said by Mr. Justice Depue in the *Foulke Case:*

"If the parties are strangers in title, possession and the exercise of rights of ownership are in themselves, in the absence of explanatory evidence, proof of an ouster of the true owner; whereas, in cases of privity of title such as subsists between tenants in common, the acts of possession

of one tenant will, in the absence of satisfactory evidence to the contrary, be referred to the community of title, and there must be clearer and more decisive evidence of an ouster by one tenant in common of his associate than is necessary to prove that a person having no right to possession had ousted an owner in severalty."

There should be yet clearer and yet more decisive evidence where it is claimed that a remainderman, who has no present right of possession, has been disseized by one who possesses under the authority of a life tenant. It was said in *Austin v. Rutland Railroad Co., 45 Vt. 215,* that there is no privity between the life tenant under a will and a remainderman under the same will, that the remainderman takes from the testator, not from the tenant for life, and that therefore the possession of the life tenant will not inure to the remainderman. It seems that if the possession of the life tenant will not inure to the remainderman, it ought not to count against him. In New York the rule has been stated to be that "during the life of the tenant for life neither his possession nor that of his grantee can be adverse to that of the remainderman" (*Jefferson v. Bangs, 197 N. Y. 35; 90 N. E. Rep. 109*); in Ohio, that the statute of limitations "does not begin to run against the remainderman until the life estate has terminated; no possession can be deemed adverse to a party who has not at the time the right of entry and possession" (*Stein v. White, 109 Ohio 578; 143 N. E. Rep. 124*); in Illinois, that "the statute of limitations does not run against the remainderman or reversioner until after the life estate is ended, and it is only after the latter event occurs that possession will be adverse to the remainderman or reversioner" (*Cross v. Janes, 327 Ill. 538; 158 N. E. Rep. 694*); in Indiana, that "the statute of limitations does not begin to run against a remainderman during the life tenancy." *Chambers v. Chambers, 139 Ind. 111; 38 N. E. Rep. 334.* The right of possession was not, under any view of the law or at any time, and is not yet, in the remaindermen. The life tenants were empowered to grant away the use and possession during their lives, which still subsist. As the prop-

erty was in 1889, so it was, substantially, in 1919. A minor structure or two "went off" during Leon Dalton's time; whether by design or from the effect of the elements does not appear. Whatever may be said of the changes and alterations effected by the Sheras, the time and duration of them fall far short of the period of limitation. We think that the mere recording of the deeds, without more in the way of continuity of open and notorious disseizin than the evidence herein proves, will not serve to sustain a claim of adverse possession by the life tenants or their grantees against a remainderman.

It is not necessary for us to, and we do not, decide whether adverse possession under section 1 may ever be set running against a remainderman during a life tenancy, but we do hold, on the facts of the case, that the appellant's possession was not adverse against the remaindermen for thirty years preceding the institution of suit and was not effective to set up title in appellant or to bar the claims of the respondent remaindermen under the first section of the 1787 statute.

Under our view of the case the constitutional question does not arise. The question of allowances was not argued.

The decree below will be affirmed.

*For affirmance*—The Chief-Justice, Trenchard, Parker, Lloyd, Case, Bodine, Donges, Heher, Perskie, Dear, Wells, WolfsKeil, Rafferty, Cole, JJ. 14.

*For reversal*—None.