CARL H. B. SUMMERILL, PLAINTIFF, v. MARY E. HUNT, DEFENDANT.

Decided November 25, 1947.

For the plaintiff, *Starr, Summerill & Lloyd.*

For the defendant, *Wayland A. Lucas.*

PROCTOR, C. C. J.   This action of ejectment was tried before a jury at the Salem Circuit and at the conclusion of the testimony there were cross motions for directed verdicts. At the court's suggestion, both parties consented that the case be withdrawn from consideration of the jury and the case was submitted to the court on both the facts and the law. *Hayes* v. *Kluge,* 86 *N. J. L.* 657; 92 *Atl. Rep.* 358.

The evidence seems to be without dispute and the court finds the following to be the facts:

Garnett Summerill owned and was in possession of the premises in question, together with surrounding lands, at the time of his death on September 24th, 1896. Under his will the premises in question and the surrounding lands were devised to a number of individuals, among whom was the plaintiff Carl H. B. Summerill, as a contingent remainderman. It was stipulated by the parties that the plaintiff is the ultimate devisee of the premises in question under the aforesaid will.

On September 4th, 1915, the Salem and Penns Grove Traction Company was incorporated pursuant to chapter 172, *Pamph. L.* 1893; *N. J. S. A.* 48:15–6, *et seq.,* for the purpose of operating a street railway. Following its incorporation the traction company commenced condemnation proceedings, in accordance with the aforesaid act under which it was incorporated, against the premises in question, which resulted in a condemnation award dated April 24th, 1916, and recorded June 26th, 1916, in the clerk's office of Salem County. It

appears that everyone having any interest in the premises was made a party to the condemnation proceedings. The award of the commissioners, duly appointed by the Supreme Court, is stated as follows:

"We do award that the said company pay to William G. Summerill and John M. Summerill, Trustees under the Will of Garnett Summerill, deceased, the sum of Four thousand dollars ($4000.00) said sum includes an award for fencing as well as a full and complete award for the value of the land taken and the damages thereto, and to the remaining lands of said Trustee, and for all other damages, costs and expenses in these proceedings of said Trustees under the Will of Garnett Summerill, deceased.

"And we do further award that the said Company pay to James B. Summerill, Lessee and *Cestui Que Trust*, and to Charles H. L. Summerill, personally as Lessee and *Cestui Que Trust*, and as Guardian of Carll H. Summerill, a minor. Contingent Remainderman, in full for all their damages of any nature whatever and their interest, whatever it may be in said lands as well as for all their costs and expenses of every kind in this proceeding, the sum of Four thousand dollars ($4000.00).

"Dated April 24th, 1916."

The Salem and Penns Grove Traction Company operated the said street railway over the premises in question thereafter and until about the year 1930, when the said company removed its tracks and wooden ties therefrom. Apparently the traction company had encountered financial difficulties. It was declared insolvent by a decree of the Court of Chancery on April 20th, 1933, and Charles J. Degnan was appointed its receiver. On May 10th, 1934, the receiver was authorized by the Court of Chancery to sell the premises to Earl B. Hunt for the sum of $700 and on June 11th, 1934, the aforesaid Charles J. Degnan, receiver of the Salem and Penns Grove Traction Company, conveyed the premises in question by a bargain and sale deed to the aforesaid Earl B. Hunt. This deed, which was recorded in the clerk's office of Salem County in Book 215 of Deeds, page 348, provided that the premises were conveyed by the receiver to the aforesaid Hunt.

"Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof. And also, all the estate, right, title and interest, property, possession, claim and demand whatsoever, as well in law as in equity, which the said Corporation was seized and of the said Party of the First Part hereto, of, in and to the above described premises, and every part and parcel thereof, with the appurtenances.

"To have and to hold all and singular the above mentioned described premises, together with the appurtenances, unto the said Party of the Second Part his heirs, executors, administrators, and assigns forever. And the said Party of the First Part, for himself, his successors and assigns, does covenant, promise and agree to and with the said Party of the Second Part, that he has not made, done or suffered any act, matter or thing whatsoever since his appointment as such Receiver as aforesaid, whereby the above granted premises, or any part thereof, are, shall or may be impeached, charged or encumbered in any manner whatsoever."

At the time of the receiver's conveyance of the premises to Earl B. Hunt, there was a small electric transformer station upon the premises. Hunt converted the station into a lunchroom and also constructed a small gasoline station upon the premises. The defendant Mary B. Hunt is the successor in title to Earl B. Hunt by a devise contained in his will. At the present time the defendant leases the gasoline station and lunchroom to a third party.

The property has not been used for the purpose of a street railway since 1930 and the charter of the Salem and Penns Grove Traction Company was revoked by proclamation of the Governor January 8th, 1941. *Pamph. L.* 1941, *pp.* 1111 and 1175.

The primary question for determination relates to the quality of the estate in the lands in question which was acquired by the Salem and Penns Grove Traction Company pursuant to the condemnation proceedings. If the traction company acquired an estate in the lands in fee-simple absolute, the defendant is entitled to that estate as a successor

in title. If, on the other hand, the traction company did not acquire such an estate but only a qualified or conditional estate dependent upon a continuing use of the lands for the purpose for which it was incorporated, and if such use has been abandoned, then the defendant's title will be no greater than that which the traction company obtained and there will be a reversion of title to the owner, or his successor in title, the plaintiff, whose lands were taken by condemnation.

Chapter 172, *Pamph. L.* 1893; *N. J. S. A.* 48:15–6, *et seq.,* under which the Salem and Penns Grove Traction Company was incorporated, was a general statute enacted primarily to make possible the change in motive power from horses to other means of traction, especially electricity. That statute contained a provision as to the procedure to be followed by traction companies in the exercise of the power of eminent domain granted to companies incorporated thereunder. The General Eminent Domain Act of 1900, *Pamph. L.* 1900, *ch.* 53; *N. J. S. A.* 20:1–1, *et seq.,* provided for the procedure in condemnation and superseded the provisions of the 1893 act relative thereto. *Paterson and State Line Traction Co.* v. *DeGray,* 70 *N. J. L.* 59; 56 *Atl. Rep.* 250. In order to determine the quality of the estate in the premises in question acquired by the traction company, it is necessary to examine both the 1893 act and the 1900 act. The language of the 1893 act does not specify in so many words the kind of an estate in land which may be acquired by condemnation. There is nothing in the language which suggests that the traction company will be authorized to acquire an estate in lands in fee-simple absolute by the exercise of the power of eminent domain. Section 14 of the aforesaid act provides for the appointment of commissioners to appraise the damage to the owners and the filing of said report in the county clerk's office, after which it provides, "and thereupon and on payment or tender of payment of the respective amounts assessed and awarded as herein provided, the said company is hereby empowered to *take possession of the lands and easements* in said report mentioned *required for any of the purposes aforesaid, and to have, hold, use, occupy, possess and enjoy the same for any or all of said purposes."* (Italics supplied.)

It is my opinion that the word "lands" mentioned above was intended by the legislature to mean only such right or estate in lands necessary for the use of a street railway company. *Cf. New Jersey Zinc and Iron Co.* v. *Morris Canal and Banking Co.,* 44 *N. J. Eq.* 398; 15 *Atl. Rep.* 227; *affirmed,* 47 *N. J. Eq.* 598; 22 *Atl. Rep.* 1076. Moreover, section 21 of the act provides that upon the merger of two traction companies that all the rights, privileges and franchises of each of said companies and all property, &c., be deemed to be transferred to and vested in the new corporation without further act or deed, "and all property, all rights of way and all and every other interest shall be as effectually the property of the new corporation as they were of the former corporations, parties to said agreement; and the title to real estate, either by deed or otherwise, under the laws of this state vested in either of such corporations *shall not be deemed to revert* or be in any way impaired by reason of this act." (Italics supplied.)

It will be noted that the legislature provided against a reverter in case of merger. Had the legislature intended that a fee-simple absolute should be acquired on condemnation, the language relating to reverter upon merger would have been idle words.

The legislature in 1908 supplemented the 1893 act by providing a method of re-location of lines. *Pamph. L.* 1908, *ch.* 136; *N. J. S. A.* 48:15–16, 48:15–27. Section 3 of said act, *N. J. S. A.* 48:15–27, provides as follows:

"In case such company has acquired by condemnation any land or easement therein along the original route so changed as aforesaid, so much of said land so acquired as aforesaid as is not within the amended route shall upon the construction of such railway along said amended route *revert to the original owners* thereof." (Italics supplied.)

The above act further illuminates the intendment by the legislature that the condemnor would not acquire a fee-simple absolute. For if the traction company had acquired a fee-simple absolute in the premises in question, the legislature would have been without power to provide for a reversion to the original owner had the traction company relocated its lines.

The General Eminent Domain Act, *Pamph. L.* 1900, *ch.* 53; *N. J. S. A.* 20:1–1, *et seq.*, which was in force at the time of the condemnation proceedings provides that any corporation "having power to take land or other property for public use, shall have determined to acquire land or other property pursuant to authority conferred by law and cannot acquire such land or other property by agreement with the owner, whether by reason of disagreement as to price, or the legal incapacity or absence of the owner, or his inability to convey valid title, or the lack of authority of the party determining to acquire the property to do so by agreement, or by reason of any other cause, the compensation shall be ascertained and paid in the manner directed by this act." *Pamph. L.* 1900, *p.* 79; *N. J. S. A.* 20:1–1.

After providing for the method of obtaining the appointment of commissioners and for the hearing by the commissioners and for the incidental procedure, the statute then provides that "Upon the filing of the report of the commissioners, and upon payment or tender of payment of the amount awarded, as hereinafter provided, the petitioner is hereby empowered to enter upon and take possession of said land or other property for the purposes for which the same was authorized to be taken * * *."

These provisions of the act plainly disclose that the land taken by condemnation shall be for the authorized purpose (establishment of street railways) and not otherwise.

It is my opinion that the before mentioned statutes, fairly construed, did not authorize the taking of a fee-simple absolute by the traction company in its condemnation proceedings, but that they permitted the taking only of a qualified fee.

Had the legislature provided especially for the acquisition of a title in fee-simple absolute by condemnation, the question would at once arise as to the constitutionality of the act. It appears to be the settled law that a fee-simple absolute cannot be acquired by condemnation.

Mr. Justice Lloyd, speaking for the Supreme Court in the case of *Frelinghuysen* v. *State Highway Commission,* 107 *N. J. L.* 218; 152 *Atl. Rep.* 79, said:

"The present constitution provides in article 1, section 16

that 'private property shall not be taken for public uses without just compensation.' This is a recognition of a legislative power to take private property for a public use, but is far from giving authority to take such property for other than public uses. When the state takes the property of its citizens for highway purposes, it acquires an easement only, and it would seem that it is empowered to take only so much of the title as is essential to the public use authorized. *New Jersey Zinc and Iron Co.* v. *Morris Canal and Banking Co..* 44 *N. J. Eq.* 398, 404; 15 *All. Rep.* 227. To take all the right, title and interest of an owner obviously may be beyond such necessity and be a contradiction in terms of the right to acquire an easement only. Public uses are constantly changing and particularly with regard to the lands occupied by our highways; the courses and directions of the highways are frequently altered and upon the abandonment of such lands for such use, unless the state holds a greater title by the voluntary act of the owner, the easement ceases and the state has no further interest.

"To sustain the contention of the commission in this case would open the door to wide and dangerous invasions of private property. A power thus conferred would permit the acquisition of private property for a public use with its ultimate destination intended to be devoted to a private use, and foreign to the cause for which it was condemned.

*"Our view is that this power does not exist * * *."*

(Italics supplied.)

The Court of Errors and Appeals in affirming the Supreme Court adopted the opinion of Mr. Justice Lloyd. 108 *N. J. L.* 403; 158 *Atl. Rep.* 465. *Frelinghuysen* v. *State Highway Commission, supra,* has been followed and the principles therein enunciated have been reaffirmed in the later cases of *Camden Forge Co.* v. *Camden County Park Commission,* 14 *N. J. Mis. R.* 626; 186 *Atl. Rep.* 519; *Holcomb* v. *Western Union Telegraph Co.,* 109 *N. J. L.* 551; 162 *Atl. Rep.* 760, and *Wolf* v. *State Highway Commission,* 110 *N. J. L.* 237; 164 *Atl. Rep.* 470. Assuredly, if the State of New Jersey, or a political subdivision thereof, has not the power under the present constitution to acquire a fee-simple absolute by con-

demnation, a private corporation does not have that power. The cases of *Bentley* v. *Newark*, 108 *N. J. L.* 317; 158 *Atl. Rep.* 463, and *Carrol* v. *Newark*, 108 *N. J. L.* 323; 158 *Atl. Rep.* 458, relied upon by the defendant and both of which cases were decided the same day the Frelinghuysen case was affirmed by the Court of Errors and Appeals, do not hold a contrary view. In the Bentley case and the Carrol case the court found that the public use had not ceased to exist. Chief Justice Case (then Mr. Justice Case), who wrote the opinions in both cases, said at the conclusion of each opinion that as the City of Newark was still devoting the lands to a public use, it was not necessary to determine whether the title held by the city by condemnation was a fee-simple absolute or a fee-simple determinable.

The case of *Currie* v. *New York Transit Co.*, and *National Docks Railway Co.*, 66 *N. J. Eq.* 313; 58 *Atl. Rep.* 308, is also relied upon by the defendant. That case does lend support to the right of the legislature to authorize the condemnation of lands in fee-simple absolute. However, even with such legislative authority, the court clearly indicates that its decision was based on the actual continuance of the use for which the property was acquired. The decision was to the effect that an additional and unauthorized use would not be enjoined, and the estate of the condemnor would not be divested, so long as the condemnor "continues to devote the land to the uses which its charter prescribes," and "so long at least as its corporate life continues to exist."

There is, therefore, no conflict between the decision in the Currie case and the holding in the Frelinghuysen case. In the present case there has been a cessation of the use for which the premises were condemned. The Currie case is not in point.

The general rule where property is condemned for a public use and then abandoned is well stated in the annotation in 136 *A. L. R., p.* 320, as follows:

"Although there is some disagreement in the cases involving the effect of the abandonment of land condemned for railway purposes upon the title to such land, with respect to the precise nature of the interest received by the railroad

company under the condemnation proceedings (this question being principally controlled by the provisions of the statute under which the eminent domain proceeding was had), there seems to be general agreement among the decisions that, assuming that the interest received by the railroad was less than a fee simple absolute, the title to the land condemned reverts to the original owner, or his heirs or assigns, upon abandonment thereof for railroad uses."

While no New Jersey cases are cited in the annotation, the court decisions in this state would seem to indicate that there is a reversion upon abandonment of the use for which the property was condemned. In *Slingerland* v. *Newark*, 54 *N. J. L.* 62; 23 *Atl. Rep.* 129, the city brought proceedings to condemn land of the prosecutor for a water supply. The prosecutor raised the objection that the city never intended to use the land for that purpose. The court in its opinion said:

"But the same uncertainty attends almost every condemnation; after the taking something may occur to prevent the actual user. The common effect of such an occurrence is that the land reverts to the prior owner. Such would be the consequence here. The water company acquires no title whatever, and the city acquires title for the specified use only, on failure of which the rights of the former owner would come into play. It can afford the prosecutor no ground of complaint that his rights may so soon revive."

*Paterson* v. *Kearney*, 84 *N. J. L.* 456; 87 *Atl. Rep.* 103; *affirmed*, 87 *N. J. L.* 327; 93 *Atl. Rep.* 1086, was a condemnation proceeding by a town to acquire a water supply. The prosecutors raised the objection that the proceedings were not within statutory authority since the real object was to authorize the diversion of water by a private water company. As to this the court in its opinion said:

"* * * If that is not the real object, or if the water is diverted to some other use not authorized, the right acquired will be at an end, just as land reverts to the prior owner when the use for which it is condemned is abandoned."

The purchaser from the receiver and his successor in title, the defendant, have used the premises for the purposes of a

restaurant and gas station and there is no evidence of any intent to attempt to devote the property to street railway purposes. The actual abandonment of the use of the land in question by the traction company for street railway purposes is evidenced by the actual removal of the tracks, ties and rails, &c., from the land, followed by a receivership proceeding, the sale of the land by the receiver, dissolution of the traction company by proclamation for non-payment of taxes, and an alien use of the land.

The defendant contends that there was no intentional abandonment and cites *McConihay* v. *Wright,* 121 *U. S.* 201; 7 *S. Ct.* 940. That case was covered by a state statute which provided that no forfeiture of title on the ground of abandonment could be enforced except by the state. The case is not in point.

It is clear that the use for which the premises were acquired by condemnation has been abandoned. The right of re-entry for a condition broken has arisen and exists in favor of the plaintiff, and is properly asserted by a suit in ejectment. *Cornelius* v. *Ivins,* 26 *N. J. L.* 376.; *Carpender* v. *City of New Brunswick,* 135 *N. J. Eq.* 397; 39 *Atl. Rep.* (2d) 40.

The plaintiff's right of possession of the premises in question is clear and judgment is rendered accordingly in favor of the plaintiff and against the defendant.