25 N.J. Super. 342 (1953)
96 A.2d 417
ALTA VALENTINE, PLAINTIFF-APPELLANT,
v.
LESTER LAMONT AND MARION LAMONT, HIS WIFE, DEFENDANTS AND THIRD-PARTY PLAINTIFFS-RESPONDENTS,
v.
BOARD OF EDUCATION OF THE CITY OF JERSEY CITY, HUDSON COUNTY, A BODY CORPORATE, THIRD-PARTY DEFENDANTS-RESPONDENTS
v.
ANTHONY J. LAMONT, INTERVENOR-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 24, 1952.
Decided April 13, 1953.
*344 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
*345 Mr. Louis G. Morten argued the cause for plaintiff-appellant.
Mr. Theodore Rabinowitz argued the cause for defendants and third-party plaintiffs-respondents, Lester Lamont and Marion Lamont.
Mr. Edmund S. Johnson argued the cause for intervenor-respondent Anthony J. Lamont.
Mr. Robert H. Doherty argued the cause for third-party defendant-respondent, Board of Education of Jersey City.
The opinion of the court was delivered by GOLDMANN, J.A.D.
The basic question for determination on this appeal is the nature of the title acquired by the Board of Education of the City of Jersey City when it condemned the property in question for school purposes in 1922. The Law Division concluded that the board had acquired a fee simple absolute from plaintiff's ancestor, 20 N.J. Super. 454 (1952). We agree.
On July 19, 1922 the Board of Education of Jersey City instituted condemnation proceedings pursuant to L. 1903 (2d sp. sess.) c. 1, sec. 47, as amended by L. 1922, c. 226, sec. 1 (now R.S. 18:6-24), and in conformity with the Eminent Domain Act (Revision of 1900) (now R.S. 20:1-1 et seq.), to acquire title to 15 Dick Street, Jersey City, and other adjacent properties, for the purpose of enlarging No. 11 School. Emma Maslin was the owner of 15 Dick Street, a one-family frame dwelling which still stands. Commissioners in condemnation were appointed and fixed the value of the Maslin property at $13,600. After a hearing duly held, the commissioners' report was confirmed and the board of education paid Mrs. Maslin $13,600 as the fair market value for her property. She took no appeal.
The properties needed for enlarging the school were then occupied by monthly tenants. The board continued to collect rentals through the years 1922 to 1945, paid real estate taxes and water charges to the City of Jersey City, and bore the *346 expense of insurance, maintenance and repair of the properties. During that entire period of time the board assumed and exercised complete control and dominion of the properties.
Mrs. Maslin died intestate on May 27, 1928, leaving Mary L. Stinard as her only surviving heir. Mrs. Stinard died intestate on January 22, 1934, leaving three surviving heirs: her son Percy, her granddaughter who is the plaintiff, and a grandson Rutherford L. Stinard. The whereabouts or existence of Percy are unknown, and Rutherford resides in New York. The fact that these two heirs were not joined as parties plaintiff or defendant is not important in view of the decision we reach.
In September 1945 the board of education adopted a resolution declaring that the various parcels acquired by condemnation were no longer needed for school purposes, and directed that they be sold at public sale under R.S. 18:5-25 and 26. The minimum sales price for 15 Dick Street was fixed at $5,900. Defendant Lester Lamont was the successful bidder at the public sale, having bid $5,900. On March 21, 1946 the board adopted a resolution ratifying the public sale. Thereafter, on April 9, 1946 the board executed and delivered a bargain and sale deed conveying the said premises to Lester Lamont and Marion, his wife, for $5,900. Intervenor Anthony J. Lamont holds a $4,000 first (purchase money) mortgage executed by the Lamonts on April 15, 1946.
At no time during the period from 1922 to 1946 did plaintiff or her predecessors in title ever dispute the possession or title of the board of education. The same is true as to plaintiffs' possession or title from April 9, 1946 to the institution of this action. It was not until the complaint was filed on January 11, 1952 that anyone made any claim that the board had acquired no greater estate than an easement or fee simple determinable in 15 Dick Street by virtue of the 1922 condemnation proceedings.
The right of eminent domain is "an inseparable attribute of sovereignty  an inherent power founded on the *347 primary duty of government to serve the common need and advance the general welfare." Bergen County Sewer Authority v. Borough of Little Ferry, 5 N.J. 548, 552 (1950); Ryan v. Housing Authority of Newark, 125 N.J.L. 336, 340 (Sup. Ct. 1940). The power to take private property for public use goes back perhaps as far as Roman times. 1 Annals of Tacitus 75. The term "eminent domain" ("dominium eminens") seems to have originated with Grotius, who declared that the state or he who acts for it may use and even alienate and destroy the property of its subjects for the ends of public utility, but added that "when this is done the state is bound to make good the loss to those who lose their property." 3 De Jure Belli et Pacis, c. 20.
The power of eminent domain does not require recognition by constitutional provision; it is primarily an absolute and unlimited power, and theoretically exists in this form in the ultimate source of authority in every organized society. National Docks R. Co. v. Central R. Co., 32 N.J. Eq. 755, 763-4 (E. & A. 1880). Accordingly, positive assertion of limitations upon the power is required. That requirement is met by provisions such as are found in most state constitutions relating to the taking of property by eminent domain. It should be emphasized that such provisions neither directly nor indirectly grant the power of eminent domain, but are simple limitations on the power already in existence which would otherwise be unlimited. 1 Nichols on Eminent Domain (3d ed. 1950), sec. 1.14, pp. 8 et seq.
The history of eminent domain in the American Colonies seems to sustain the doctrine that "the power of eminent domain, as it exists untrammeled by constitutional limitations, extends to the taking of any property within the jurisdiction of the state for the public good, subject only to the moral obligation of making compensation." Idem, sec. 1.22, p. 46. When the Colonies broke away from the Crown, each became a sovereign state in its own right, with absolute control over persons and property within its jurisdiction. Each became vested with the general power of eminent domain. The power could be exercised directly by the legislature, *348 or could be delegated to municipalities or other governmental subdivisions. National Docks R. Co. v. Central R. Co., above, at p. 764. The legislature could also grant the power of eminent domain to public corporations, such as school districts or boards of education. Cf. Wendel v. Board of Education of Hoboken, 75 N.J.L. 70 (Sup. Ct. 1907), reversed on other grounds, 76 N.J.L. 499 (E. & A. 1908).
Under the terms of the typical constitutional provision private property cannot be taken for public use without making just compensation. Such provision is contained in the Fifth Amendment to the United States Constitution as a limitation on the powers of the Federal Government. The same provision, variously worded, appears in the constitutions of all but one of the states. The first New Jersey Constitution, adopted in 1776, contained no express restrictions on the taking of private property for public use. However, it was early recognized that the power of the Legislature in the area of eminent domain was not omnipotent; we find the dictum in Attorney-General v. Stevens, 1 N.J. Eq. 369 (Ch. 1831), that the Legislature "cannot authorize private property to be taken for public purposes, without providing for a just remuneration." And in Scudder v. Trenton Delaware Falls Co., 1 N.J. Eq. 694 (Ch. 1832), the Chancellor observed that although the right of eminent domain was one appertaining to sovereignty  one which the state might freely exercise on all proper occasions  yet private property was not to be taken for private use. "The legislature has no right to take the property of one man and give it to another, even upon compensation being made." The principles underlying the power of eminent domain, and the limitations upon the exercise thereof, were comprehensively stated by Justice Dayton in Sinnickson v. Johnson, 17 N.J.L. 129 (Sup. Ct. 1839), five years before the adoption of the Constitution of 1844. That Constitution provided, in Art. I, par. 16, that:
"Private property shall not be taken for public use, without just compensation; but land may be taken for public highways, as heretofore, until the legislature shall direct compensation to be made." *349 Such was the constitutional provision at the time of the 1922 condemnation proceedings under consideration.
Plaintiff's claim is that the Board of Education of Jersey City took only an easement or at best a fee simple determinable by the condemnation, and that when it declared the property in question no longer needed for school purposes and sold and conveyed it to the Lamonts, there was a reverter and plaintiff was entitled to possession of the land. On the other hand, the Lamonts, together with the intervening mortgagee and the board of education, insist that the board acquired a fee simple absolute.
The 1922 condemnation proceedings, as already mentioned, were instituted pursuant to the provisions of L. 1903 (2d sp. sess.) c. 1, sec. 47, as amended by L. 1922, c. 226, sec. 1 (now R.S. 18:6-24), which provided:
"Such board [of education] shall, in and by its corporate name, * * * purchase, lease, receive, hold and sell property, real and personal, take and condemn land and other property for school purposes in the manner provided by law regulating the ascertainment and payment of compensation for property condemned or taken for public use. * * *"
This last reference was, of course, to the Eminent Domain Act (Revision of 1900), now R.S. 20:1-1 et seq. It is to be noted that neither the Constitution of 1844, Art. I, Sec. 16, the cited statute of 1903, nor the Eminent Domain Act limited the estate that might be acquired in condemnation.
We are not concerned here with the question of whether the condemnation of lands for school purposes is a taking for a public use. That is established law, and conceded.
No precise words are necessary in a statute to authorize condemnation of a fee simple absolute, nor is it necessary that the authority to take a fee be given in express terms. 11 McQuillin, Municipal Corporations (3d ed. 1950), sec. 32.108, p. 509; City of Newton v. Perry, 163 Mass. 319, 39 N.E. 1032 (Sup. Jud. Ct. 1895). "The statute is to be read, not under the necessity of finding fixed phraseology, but to ascertain its intent, because this intent, clearly found, will *350 prevail." Carroll v. City of Newark, 108 N.J.L. 323, 327 (E. & A. 1932).
In determining the quality of the estate acquired by the board of education in 1922, we are not limited to a consideration of the quoted section of the School Law of 1903, as amended. We may legitimately consider all statutory provisions in pari materia in arriving at the intention of the Legislature.
We have, first, the language of the cited section itself, which authorizes a board of education to "purchase, lease, receive, hold and sell property, * * * take and condemn lands and other property for school purposes * * *." (The words "for school purposes" do not limit the estate acquired in condemnation, but merely describe the public use and thereby justify the exercise of the power of eminent domain. Hopewell School Dist. No. 28 v. Bush, 179 Ark. 316, 15 S.W.2d 985 (Sup. Ct. 1929); Cf. Bentley v. City of Newark, 108 N.J.L. 317, 318 (E. & A. 1932)). We have, additionally, the following statutory provisions:
"L. 1929, c. 333, sec. 1 (now R.S. 18:5-25): Every board of education may sell or dispose of any lands or buildings or any right or interest therein which ceases to be suitable or convenient for the use for which they were acquired or are no longer needed for school purposes, whether said lands or buildings or any right or interest therein have been heretofore acquired or may hereafter be acquired by said board of education by purchase or through condemnation proceedings for school purposes." (Italics ours)
And
R.S. 18:6-16: "The title to school property, real and personal, previously acquired by the district, or by any previous body for school purposes in the district, or in the municipality in which the district is situated, or by anybody in such municipality, and the title to all property to be acquired for school purposes in the district shall vest in the board incorporated under the provisions of this chapter." (Italics ours)
The authority given a board of education, under R.S. 18:5-25, to sell or dispose of any real estate no longer needed for school purposes, whether acquired by purchase or through *351 condemnation proceedings, is an indication that the Legislature considered that a fee simple absolute becomes vested in the board through condemnation. Cf. Brooklyn Park Com'rs. v. Armstrong, 45 N.Y. 234 (Ct. App. 1871); Sanitary District of Chicago v. Manasse, 380 Ill. 27, 42 N.E.2d 543 (Sup. Ct. 1942). The language of R.S. 18:6-16, that "title to school property * * * previously acquired * * * shall vest in the board," does not appear consistent with a legislative intention that only an easement be acquired through condemnation, rather than a fee simple absolute.
We have, also, the provisions of the Eminent Domain Act under which the board of education proceeded. R.S. 20:1-12 provides that
"The report of the commissioners, together with the petition and orders, or a copy thereof certified by the clerk of the county and proof of payment or tender of the amount awarded shall be plenary evidence of the right of the petitioner to have, hold, use, occupy, possess and enjoy the land and other property." (Italics ours)
In Currie v. New York Transit Co., 66 N.J. Eq. 313 (E. & A. 1904), Chief Justice Gummere considered a similar provision in the condemnation provisions of the General Railroad Act. After analyzing the earlier cases dealing with the quality of the estate taken on condemnation, he held that in the light of language such as is now found in R.S. 20:1-12, italicized above, the railroad company there was not limited to acquiring a mere easement or right of passage over land, but to acquire the land itself.
The text of 3 Sutherland, Statutory Construction (3d ed. 1943), § 6504, p. 256, is appropriate:
"* * * A strained and narrow application of statutes granting eminent domain power should be avoided, and a reasonable interpretation preferred with a view to the purposes and objectives to be subserved. The power of eminent domain has been, and remains a very necessary element for the accomplishment of great public enterprises. Its constitutional authorization is wholly dependent upon a public use, and a just reimbursement of the property owner. Therefore, the interests of the public, as well as the condemned property *352 owner [sic] must be considered in arriving at the limits of the powers intended to be conferred."
We agree with the conclusion reached by Judge Smith in the court below that, short of words expressly authorizing or directing the taking of a fee simple absolute, the Legislature could hardly have expressed any clearer intention that a school board acquires such a title through and by condemnation proceedings.
We arrive at the same result by considering the general rule that in condemnation proceedings an estate of such quality may be taken as is reasonably necessary for the accomplishment of the purpose in aid of which the proceedings are brought.
As was said in Driscoll v. City of New Haven, 75 Conn. 92, 52 A. 618, 620 (Sup. Ct. Err. 1902):
"* * * In the absence of express and precise provisions, the intention of the act and the construction to be put upon its terms may be gathered from its general scope and tenor, and the nature of the public use for which the condemnation is authorized. If the legislative intention to vest the fee is thus made clear, and this intention is consistent with the language employed, effect will be given to the intention. This is especially true where a remaining private ownership is inconsistent with the use for which the land is taken, and where the purposes of the condemnation will not be satisfied by the taking of a lesser estate or easement."
In Carroll v. City of Newark, 108 N.J.L. 323 (E. & A. 1932), Justice Case considered the nature of the interest taken by the City of Newark in condemning lands for market purposes, and to that end analyzed the statutory provisions involved. We adapt his language (at p. 327):
"The statute * * * anticipates the exercise of complete control over the lands by the city. * * * The land is not for the indiscriminate use of all the inhabitants of the city, as for instance is a highway, or as is even a park, but is for such selective use as must be maintained when [used for school purposes]."
The justice distinguished certain public uses  the highway being a conspicuous instance  that long had been regarded as easements, and went on to say (at pp. 329-330):
*353 "* * * But there is an inherent cleavage between such an easement, or indeed between any easement, and the estate that comes to a municipality under acquisition of lands for a purpose that may endure forever and that, while it lasts, embraces exclusive possession and exclusive right of possession.

* * * * * * * *
"* * * The city acted to acquire the entire quantity and extent of interest permitted by the statute. That full measure of estate was necessary for the character of improvement and use contemplated by the statute and actually put into effect by the city."
In Brooklyn Park Com'rs. v. Armstrong, 45 N.Y. 234 (Ct. App. 1871), the court, in holding that plaintiff acquired a fee simple absolute in condemning certain lands for park purposes, noted (at p. 240):
"* * * But, in the idea of a public park is comprehended more, than a use, either occasional or limited by years, or susceptible of coexistence with a private right capable of concurrent exercise. * * * [T]he power to take lands for a public park, unless limited by the terms in which it is given, would, to a large degree, carry with it the right to acquire the largest title in the lands taken. That the extent of the right acquired in the lands by the taking of them for public use depends, in some measure, upon the needs for which they are taken, is recognized and applied in this court, * * *"
There is no suggestion that when the board of education first negotiated with Emma Maslin, it sought to obtain other than a full title, a fee simple absolute. It apparently was unable to obtain her property by purchase, and so resorted to condemnation. It acted to acquire the entire quantity and extent of the estate permitted by the statute, and paid the fair market value of a fee simple absolute. There is no claim or evidence that the owner received less than the full value of the property. Mrs. Maslin accepted the $13,600 condemnation award without further objection, and the board entered into complete and exclusive possession of the premises. It would strain reason to say now that she believed she was parting with only an easement in the lands in return for the value paid, or that the school board acquired less than the absolute fee. As Justice Case said in Bentley v. *354 City of Newark, 108 N.J.L. 317, 319 (E. & A. 1932), the companion to the Carroll case:
"There is no suggestion that the city was not fully and of right in the exclusive possession and occupancy of the entire lands from the date of the condemnation * * *. It is presumed that the tribunal upon which devolved the function of fixing compensation to the owner whose property was taken appraised an estate fully commensurable in quantity and duration with the proposed use which formed the occasion and the justification for the condemnation. It was the duty of the condemnation commissioners in making the award * * * to have regard for the fact that the needs and functions of a city market [read here, "public school"] were such that the possession and occupancy by the city not only would be complete and exclusive but might last forever, and to fix their award for compensation accordingly. There is nothing in the case to indicate that the award was not made, paid and received on that basis. * * * The record contains no hint that Lindsley or his heirs ever exercised, or attempted to exercise or even asserted the right to exercise, any of the rights or privileges of ownership after the condemnation or that he or any of his heirs ever made the slightest claim to the property or any interest therein until the present plaintiff * * * brought this suit upon the theory that a reversion had resulted from the abandonment of the market use."
So here.
In dealing with the possibility of reverter in a case like this, the New York Court of Appeals, in Brooklyn Park Com'rs. v. Armstrong, above, said that when the land there was taken in condemnation for park purposes, it must be held that the owner was fully compensated at the time of the original taking, and that
"* * * the possibility that the land may at any future time revert to him by the cessation of the public use, is too remote and contingent to be considered as property at all. (P. 242)

* * * * * * * *
"* * * The public had the right to the lands on making payment, and as soon as the owner was paid he was disseised. There is no reverter. * * *" (P. 244)
And see 5 Thompson on Real Property (3d ed. 1940), § 2589, p. 360, and 1952 pocket part, p. 86.
Again adverting to the Carroll case, 108 N.J.L. 323, at p. 331:
*355 "* * * It would, we think, be an exaggeration of the essence of private ownership and a mulcting of the public purse to hold that when an individual has had his lands taken for public use and has been fully paid for those lands he, or his heirs after him, should be entitled to payment anew. * * *"
The Court of Errors and Appeals was not called upon to decide in either the Carroll or Bentley case whether the fee held by the City of Newark was a fee simple absolute or a conditional fee, because the city there had retained the property and merely converted it to a different public use. However, the reasoning of the court is so compelling that we are persuaded to the belief that had it been necessary to do so, the court would logically have gone all the way and decided that the city had in the circumstances acquired a fee simple absolute through condemnation.
Since plaintiff puts some reliance upon the statement in Summerill v. Hunt, 25 N.J. Misc. 498, 504 (Sup. Ct. 1947), that "It appears to be the settled law that a fee-simple absolute cannot be acquired by condemnation," we point out that this was mere obiter dictum. The Traction Act of 1893 (L. 1893, c. 172; now N.J.S.A. 48:15-6 et seq.), under which the traction company had brought condemnation proceedings, expressly provided for reverter under certain conditions. It is clear, as the court concluded, that the traction company took only a qualified fee. The general rule projected in the Summerill case is too broad and was not necessary to the decision.
In order to dissipate the confusion arising from some of the language in the cases, and to make clear that the power to condemn an absolute fee might be exercised, the Constitution of 1947 provides (Art. IV, Sec. VI, par. 3):
"Any agency or political subdivision of the State or any agency of a political subdivision thereof, which may be empowered to take or otherwise acquire private property for any public highway, parkway, airport, place, improvement, or use, may be authorized by law to take or otherwise acquire a fee simple absolute or any lesser interest, * * * but such taking shall be with just compensation." *356 This provision is not to be taken as indicating that a fee simple absolute could not, in certain cases, have been acquired through condemnation before the adoption of the new Constitution. There was nothing in the Constitution of 1844 limiting the quality of the estate that might so be acquired in order fully to achieve a public use  as where such use might go on forever. The reference to "any public highway, parkway, airport" in the new Constitution is meaningful, for these are instances where the courts have uniformly held that only an easement might be acquired. See, for example, Frelinghuysen v. State Highway Comm., 107 N.J.L. 218 (Sup. Ct. 1930), affirmed per curiam 108 N.J.L. 403 (E. & A. 1932).
There is no suggestion here that the acquisition of the property in question was made mala fides. There is no taint of fraud or of a concealed purpose by the board to negative the bona fides of the acquisition. Nor is there anything to indicate that the board, in determining that the premises were no longer needed for school purposes, was actuated by any consideration other than what was in the best public interest.
Although there is no New Jersey case which has dealt specifically with the question of the estate taken where property is condemned for school purposes, authority for that proposition does exist elsewhere. 3 Nichols on Eminent Domain (3d ed. 1950), § 11.209, p. 353, states that ordinarily a fee is taken for public buildings; so, also, in the case of a schoolhouse. The trustees of a rural school district were held to have acquired an absolute title in Binder v. County Bd. of Ed. for Jefferson Cty., 224 Ky. 143, 5 S.W.2d 903 (Ct. App. 1928). The statute in that case, as here, authorized the trustees to sell or dispose of an old school site, if deemed advisable. Noting that full and complete consideration had been paid in the original condemnation proceedings for the land now sought to be sold, the court observed that "it is the universal rule that the right of reverter does not arise in such cases except from the clearest and most explicit language."
*357 A similar result was reached in Pifer v. Board of Education, 25 Ohio App. 469, 159 N.E. 99 (Ct. App. 1927); Hopewell School Dist. No. 28 v. Bush, 179 Ark. 316, 15 S.W.2d 985 (Sup. Ct. 1929); and in O'Hara v. District of Columbia, 79 U.S. App. D.C. 302, 147 F.2d 146 (U.S.Ct. App. D.C. 1944), certiorari denied 325 U.S. 855, 65 S.Ct. 1183, 89 L.Ed. 1975 (1945), where the court stated that "In the absence of special circumstances it would be reasonable to presume that no estate less than absolute title is sufficient for school purposes."
We hold, therefore, that the Board of Education of Jersey City acquired a fee simple absolute in the Maslin premises as a result of the 1922 condemnation and that no reverter resulted from the determination of the board to dispose of the property in 1945 or from the sale and conveyance to the defendants Lamont which ensued.
In view of the result we have reached, there is no need to discuss the defense of laches.
The judgment is affirmed.